## A. H. BULL S. S. CO., Inc. v. UNITED STATES.
## THE MARY.

United States District Court
S. D. New York.

June 16, 1952.

Kirlin, Campbell & Keating, New York City, Clement C. Rinehart, Harold B. Finn, New York City, of counsel, for libelant.

Myles J. Lane, New York City, Benjamin H. Berman, Atty., Dept. of Justice, New York City, of counsel, for respondent.

MURPHY, District Judge.

Libelant, owner of the S.S. Mary, a vessel which was sunk by enemy action on March 3, 1942, sues upon a charter and an amendment to it to recover the sum of $7,529.57 as additional charter hire for the vessel for the period from January 23, 1942 to March 3, 1942, and the further sum of $48,250 alleged to represent the increase in war risk insurance valuation of the vessel under terms of the amendment to the charter for the vessel.

The facts are not in dispute and present two issues of law for determination: (I) Whether under the amendment to the charter libelant is entitled to additional charter hire and additional compensation for total loss of the vessel; and (II) Whether this court has jurisdiction of the suit under the Suits of Admiralty Act of 1920, 41 Stat. 525, 46 U.S.C.A. § 741 et seq. The facts will be set forth first and these two issues determined in that order.

On January 23, 1942, the Maritime Commission telegraphed libelant, in part, as follows:

"Your S.S. Mary required for National Defense Purposed. [sic] Maritime Commission will Charter Vessel upon Readiness Load on Uniform Charter Conditions Rates as Per General Order No. 49. Please Advise Readiness Date and Port. * * *"

Three days later the vessel was delivered to the Commission at Baltimore "under terms and conditions of time charter to be executed." On the same day a letter confirming its telegram was sent by the Commission indicating, among other things, that the Commission "will charter this vessel * * for a round voyage to Red Sea via port or ports and return to U. S. North Atlantic port for redelivery." After respondent's agent had loaded the vessel with a cargo of general merchandise she sailed for the Persian Gulf via the Cape of Good Hope. While en route at about 11:40 a. m. on March 3, 1942, she was sunk by enemy action.

The original written charter party dated "as of January 23, 1942" was tendered to libelant for execution on March 2, 1942, and was executed by both parties some time between March 19 and 26, 1942. Amendment to the charter was tendered to the libelant on March 27th and executed by both parties some time between May 21st and June 1, 1942.

The original charter under uniform charter conditions of the United States Maritime Commission on its form 9018-A recites its statutory authority as Public Law 101, 77th Congress, approved June 6, 1941, 55 Stat. 242, 50 U.S.C.A.Appendix, § 1273, which empowered the Commission until six months after the war "to charter any vessel" when "necessary for transportation of foreign commerce of the United States or

of commodities essential to the national defense". It is conceded that the rate of hire fixed in this charter at $27,600 per month from the time of delivery of the vessel was determined in accordance with the appropriate maximum provided in General Order 49 of the Commission, issued on December 30, 1941 and effective January 20, 1942. Similarly conceded is the correctness of determining the maximum war risk insurance valuation at $591,750 under the Commission's General Order 53, issued January 22, 1942.

Subsequently the amendment to this charter referred to above was issued. Its provisions, set forth in the margin,[1] conferred upon owners the option of receiving benefits of modifications in rates of hire (General Order 49) or insurance values (General Order 53) applicable from the date of delivery, in the event the War Shipping Administrator made such modifications prior to May 15, 1942. On May 14, 1942,

the Administrator made the modifications, establishing new schedules of rates of hire (General Order 8) and of insurance values (General Order 9). So far as "vessels included" are concerned, General Order 9 is worded almost [2] identically with General Order 8, set forth below.[3] It is important to point out that both orders include "vessels chartered under terms and conditions of charter parties tendered by the War Shipping Administration to owners of such vessels pursuant to the provisions of Sec. 902 of the Merchant Marine Act, 1936, as amended, * * *." No provision was made for vessels, like the Mary, chartered pursuant to the provisions of Public Law 101.

The libelant exercised its option for increased rates of hire by filing public vouchers on June 11, 1942, which were returned unpaid on December 2, 1943, and submitted these again together with deadweight and speed certificate from the

1. Addendum No. 1, paragraph X:
   "If the rate of hire provided for in this Charter on and after January 20, 1942 is in accordance with the appropriate maximum rate provided for in United States Maritime Commission General Order No. 49, or if the insurance value of the vessel provided for in this Charter is in accordance with the applicable value under United States Maritime Commission General Order No. 53, then in the event the Administrator, War Shipping Administration, at any time prior to May 15, 1942, modifies the schedule of rates provided for in United States Maritime Commission General Order No. 49, or the schedule of insurance values prescribed by United States Maritime Commission General Order No. 53, the Owner shall have the option of receiving the benefits of such modifications to the extent that they may be applicable to the Vessel chartered hereunder, and in such event the modified rates or values shall be applicable from the date of delivery hereunder, but in the case of rates not earlier than January 20, 1942. Such adjustment of insurance values will be made by appropriate assumption of risk, absorption of premiums on existing insurance, increase of existing insurance, or otherwise as the Administrator may determine."

2. General Order 9 in subdiv. h excepts vessels constructed "subsequent to Jan-

uary 1, 1935", instead of January 1, 1937 in General Order 8, subdiv. h, and does not exclude "Tankers" as does General Order 8, subdiv. i.

3. "1. Vessels Included. Time charter rates herein prescribed are applicable to all American-flag self-propelled ocean-going iron and steel dry cargo vessels chartered under terms and conditions of charter parties tendered by the War Shipping Administration to owners of such vessels pursuant to the provisions of Sec. 902 of the Merchant Marine Act, 1936, as amended, except—
   a) Vessels with refrigerated capacity in excess of 50% of total capacity;
   b) Combination passenger and freight vessel;
   c) Car ferries;
   d) Seatrains;
   e) Vessels which are not classed A-1 American Bureau of Shipping, or equivalent;
   f) Vessels of less than 8 knots of speed determined in accordance with General Order No. 10;
   g) Vessels of less than 1,000 tons deadweight;
   h) Vessels constructed pursuant to construction contracts made and entered into subsequent to January 1, 1937;
   i) Tankers; and
   j) Other vessels excepted from this Order by the Administrator from time to time."

American Bureau of Shipping on December 11, 1947, with similar results. Oral applications for increased insurance valuation were made to officials of the War Shipping Administration by libelant's vice-president to no avail. This libel for both increased rates of hire and insurance valuations was filed May 12, 1944.

I.

The first question, whether libelant is entitled to additional charter hire and additional compensation for total loss of the Mary under amendment to its charter and modifications of the War Shipping Administrator, turns upon the applicability of such revisions to the Mary. Unquestion-

ably the Mary was not within the letter of the Administrator's orders of modification. She had not in fact been "chartered under terms and conditions of charter parties tendered by the War Shipping Administration to owners of such vessels pursuant to the provisions of Sec. 902 of the Merchant Marine Act, 1936, as amended," as the orders required [supra, notes 2, 3]. Concededly, as her charter recited, she was chartered "pursuant to the provisions of Public Law No. 101—77th Congress, approved June 6, 1941."

The two statutes are distinct. Section 902 of the Merchant Marine Act of 1936, 46 U.S.C.A. § 1242, set forth in part below,[4] deals with requisition or purchase

4. "(a) Whenever the President shall proclaim that the security of the national defense makes it advisable or during any national emergency declared by proclamation of the President, it shall be lawful for the Commission to requisition or purchase any vessel or other watercraft owned by citizens of the United States, or under construction within the United States, or for any period during such emergency, to requisition or charter the use of any such property. The termination of any emergency so declared shall be announced by a further proclamation by the President. When any such property or the use thereof is so requisitioned, the owner thereof shall be paid just compensation for the property taken or for the use of such property, but in no case shall the value of the property taken or used be deemed enhanced by the causes necessitating the taking or use. If any property is taken and used under authority of this section, but the ownership thereof is not required by the United States, such property shall be restored to the owner in a condition at least as good as when taken, less ordinary wear and tear, or the owner shall be paid an amount for reconditioning sufficient to place the property in such condition. The owner shall not be paid for any consequential damages arising from a taking or use of property under authority of this section.

\* \* \* \* \*

"(c) If any property is taken and used under authority of this section, but the ownership thereof is not required by the United States, the Commission, at the time of the taking or as soon thereafter as the exigencies of the situation may permit, shall transmit to the person en-

titled to the possession of such property a charter setting forth the terms which, in the Commission's judgment, should govern the relations between the United States and such person and a statement of the rate of hire which, in the Commission's judgment, will be just compensation for the use of such property and for the services required under the terms of such charter. If such person does not execute and deliver such charter and accept such rate of hire, the Commission shall pay to such person on account of just compensation a sum equal to 75 per centum of such rate of hire as the same may from time to time be due under the terms of the charter so tendered, and such person shall be entitled to sue the United States to recover such further sum as added to such 75 per centum will make up such amount as will be just compensation for the use of the property and for the services required in connection with such use. In the event of loss or damage to such property, due to operation of a risk assumed by the United States under the terms of a charter prescribed in this subsection, but no valuation of such vessel or other property or mode of compensation has been agreed to, the United States shall pay just compensation for such loss or damage, to the extent the person entitled thereto is not reimbursed therefor through policies of insurance against such loss or damage.

"(d) In all cases, the just compensation authorized by this section shall be determined and paid by the Commission as soon as practicable, but if the amount of just compensation determined by the Commission is unsatisfactory to the person entitled thereto, such person shall be

478

of vessels in time of emergency proclaimed by the President. Although the phrase "to requisition or charter the use of any such property" appears in Section 902(a), 46 U.S.C.A. § 1242(a), it is evident that Congress intended to authorize the Commission to "charter the use of any such [*i. e.,* requisitioned] property." This is made clear not only in the antecedent language in Section 902(a) to which the word "such" refers, but also the provisions of subdivisions (c) and (d) of the statute, 46 U.S.C.A. § 1242(c, d) which set forth the procedure for tendering charters for vessels after they have been requisitioned [infra, note 4]. The Presidential proclamation of an unlimited national emergency on May 27, 1941, 55 Stat. 1647, No. 2487, 50 U.S.C.A.Appendix, note preceding section 1, effectuated this manner of acquisition long before the date of delivery of the Mary. Despite this statute, on June 6, 1941, an additional method of acquisition was provided for in Public Law 101, 55 Stat. 242, 50 U.S.C.A.Appendix, § 1273. Under Public Law 101, the Commission could clearly charter vessels without first exercising its

power of requisition with its possible judicial consequences of an eminent domain nature. This is made clear by Section 3 (a) [5] which would be redundant insofar as it applied to vessels of the United States if existing provisions of the Merchant Marine Act enabled the Maritime Commission to charter vessels without first requisitioning them.

However significant the difference in these two statutes, the Administrator, acting pursuant to executive order and statute which authorized him to modify contracts "with or without consideration" Public Law 354, 77th Congress, 55 Stat. 838, 50 U.S.C.A. Appendix, § 611; Executive Orders 9001, 6 Fed.Reg. 6787, December 27, 1941, 50 U.S.C.A.Appendix, § 611 note, 9054, 7 Fed.Reg. 837, February 7, 1942, undertook to limit the option of receiving benefits of upward revision of rates of hire and insurance valuations to owners of certain vessels acquired pursuant to Section 902 of the Merchant Marine Act [supra, notes 2, 3]. No compulsion of contract arising from amendment to the charter of the Mary requires extension of option of these bene-

paid 75 per centum of the amount so determined and shall be entitled to sue the United States to recover such further sum as, added to said 75 per centum will make up such amount as will be just compensation therefor, in the manner provided for by sections 41(20) and 250 of Title 28."

5. "Sec. 3. (a) During the national emergency declared by the President on September 8, 1939, to exist, but not after June 30, 1942, the United States Maritime Commission, whenever it finds that vessels in addition to those otherwise available are necessary for transportation of foreign commerce of the United States or of commodities essential to the national defense, is authorized, notwithstanding any other provision of law, (1) to charter any vessel, whether undocumented or documented under the laws of the United States or of a foreign country, deemed by the Commission to be suitable for such transportation, without regard to the provisions of section 3709 of the Revised Statutes, on a time-charter or bare-boat basis, upon such terms and conditions, and for such period or periods, as the Commission may deem necessary or desirable in the public interest, and at such rate of hire as it may deem to be fair and reasonable

in view of the attendant circumstances, and (2) to charter any vessel chartered by the Commission under clause (1) hereof to a private operator, a citizen of the United States (including a corporation, partnership, or association, only if it is a citizen of the United States within the meaning of section 2 of the Shipping Act, 1916, as amended), or to any department or agency of the United States Government, without regard to the provisions of title VII of the Merchant Marine Act, 1936, on time-charter or bare-boat basis for use in any foreign trade or service or as otherwise hereinafter provided, upon such terms and conditions, for such period or periods, and subject to such restrictions as the Commission may deem necessary or desirable for the protection of the public interest, and at such rate of hire as it may deem to be fair and reasonable. Any department or agency of the United States Government is authorized to enter into such charters. All moneys received by the Commission under the provisions of this subsection shall be deposited in the construction fund of the Commission, and all disbursements made by the Commission in carrying out the provisions of this subsection shall be paid from such fund."

fits to its owner since the amendment explicitly stated, "the Owner shall have the option of receiving the benefits of such modifications to the extent that they may be applicable to the Vessel chartered hereunder" [supra, note 1].

The omission by the Administrator of vessels such as the Mary chartered pursuant to Public Law 101 or his failure to tender vessels so chartered another charter pursuant to Section 902 of the Merchant Marine Act so as to make available the option of receiving these benefits, may have been oppressive in some instances. But the remedy in such cases, not available in the judicially declared law of contract and admiralty, must be sought in a forum other than the judiciary.

## II.

The remaining question, one ordinarily resolved at the outset but reserved until now in this case because prior determination of the controversy on its merits supplies superior perspective, is whether this court has jurisdiction of this suit under the Suits in Admiralty Act of 1920, 41 Stat. 525, 46 U.S.C.A. § 741 et seq.

Section 1 of the Act, 46 U.S.C.A. § 741, so far as here relevant provides:

"No vessel owned by the United States * * * or in the possession of the United States * * * or operated by or for the United States * * * shall [hereafter], in view of the provision herein made for a libel in personam, be subject to arrest or seizure by judicial process in the United States or its possessions: * * *."

And Section 2 of the Act, 46 U.S.C.A. § 742, provides in part:

"In cases where if such vessel were privately owned or operated * * * a proceeding in admiralty could be maintained at the time of the commencement of the action herein provided for, a libel in personam may be brought against the United States * * * provided that such vessel is employed as a merchant vessel * *."

Since it has been conceded that the Mary had been "employed as a merchant vessel" and since she was not "owned by the United States * * * or in the possession of the United States", the only question presented is whether or not she was "operated by or for the United States".

As a merchant vessel the Mary had in fact been operated "for" the United States. The United States had employed her under a time charter relationship which left the charterer in control of the voyages made, goods carried and performance of its orders by master and crew. In Matson Navigation Co. v. United States, 284 U.S. 352, 52 S.Ct. 162, 164, 76 L.Ed. 336, a time charter like the one involved here was held to be a contract for the operation of a vessel "for the United States." While in the Matson case the charter contained the recital that the ship was to be operated "for the United States", the omission of such labeling language in the instant charter in the face of substantially identical terms and conditions should not vary the result. As the Court of Appeals recently pointed out in Calmar S. S. Corp. v. Scott, 2 Cir., 197 F.2d 795, 802, per L. Hand, C. J., "It is obvious that a vessel under a voyage charter to the United States is operated 'for' the United States—indeed, were it not so, 'for' would be redundant."

Judgment for respondent.