## THE NORMAN BRIDGE.

## THE NITONIAN.

(District Court, S. D. New York. November 28, 1922.)

1. **Shipping** ⊂═⊃3½, New, vol. 8A Key-No. Series—**Vessel under time charter to United States, and not operated solely as "merchant vessel," is not subject to lien.**

    A vessel under a time charter to the United States during the war, and engaged at the time of the collision in carrying fuel oil for the British government to aid it in prosecuting the war, was not employed solely as a "merchant vessel," and therefore was not subject to a lien for damages resulting from the collision, which could be enforced against it after its return to the owners.

2. **United States** ⊂═⊃133—**Set-off against government vessel can be pleaded after lapse of time for suit.**

    Act March 9, 1920, § 5, relating to suits for damages caused by government vessels, and limiting the time within which such suit may be brought, applies only to a suit brought against the United States, and not to a set-off by respondent in a suit in admiralty brought by the United States, so that such set-off may be pleaded after the expiration of the time limited.

3. **United States ⬷⬌130—Subject to proper set-off to claim in suit brought by it.**

   The United States government, by bringing suit for damages for a collision, subjected its claim to any proper set-off.

4. **Collision ⬷⬌40, 77—Both vessels in convoy held at fault for collision.**

   On cross-libel for a collision between two vessels in a convoy, both vessels *held* at fault, the vessel which should have been in the lead for starboarding too soon on a zigzag course, and for changing to a port helm, and both vessels for not maintaining as vigilant a lookout as was required under the circumstances.

In Admiralty. Cross-libels by the Frederick Leyland Company, Limited, against the Steamship Norman Bridge, of which the United States was claimant, and by the United States against the steamship Nitonian, of which the Frederick Leyland Company, Limited, was claimant, to recover damages resulting from a collision. Decree directed, allowing United States to recover only the damages suffered by the Norman Bridge which exceeded those suffered by the Nitonian.

Burlingham, Veeder, Masten & Fearey, of New York City (Charles C. Burlingham and J. Harvey Turnure, both of New York City, of counsel), for Frederick Leyland Co., Limited.

William Hayward, U. S. Atty., of New York City (Horace M. Gray, of New York City, of counsel), for the United States.

WARD, Circuit Judge. These two suits arise out of a collision between the oil tank steamer Norman Bridge and the steamer Nitonian September 19, 1918, about 1 a. m., while proceeding in a convoy from New York to Plymouth, England. Pleadings were filed as follows: October 30, 1918, Frederick Leyland Company, Limited, filed its libel as owner of the Nitonian against the Norman Bridge. December 4, 1918, the United States, appearing specially, filed objections to the jurisdiction. January 16, 1920, the United States, appearing specially, answered. Eo die the United States filed its libel against the Nitonian. May 5, 1922, Frederick Leyland Company, Limited, claimant, filed its answer.

The status of the Norman Bridge is made clear by the following exhibits: August 15, 1918, the Pan-American Petroleum & Transport Company, as owner, entered into a requisition charter with the United States through the United States Shipping Board. This agreement amounted to a demise of the steamer under a bare boat charter to the United States as time charterers, the steamer to be operated by the Pan-American Company, as agents of the United States. On the same day a requisition agreement was entered into between the same parties. September 12, 1918, the United States Shipping Board as "chartered owner by requisition" entered into a contract with the British shipping controller, as charterer, to carry a cargo of fuel oil from New York as ordered upon signing bills of lading. The British government had merely the benefit of the steamer's carrying capacity. September 13, the master signed a bill of lading to carry the fuel oil to Devonport, England, for orders. September 14, the British War Mission was billed for the freight by the United States Shipping Board, Pan-American Company, agents. September 15, the Pan-American

⬷⬌For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Company billed the United States Shipping Board for charter hire and disbursements. July 25, 1919, the Pan-American Company submitted its account to the United States Shipping Board. March 12, 1920, the account was finally settled.

[1] On the question of jurisdiction the claimants of the Nitonian rely upon the case of the Lake Monroe, 250 U. S. 246, 39 Sup. Ct. 460, 63 L. Ed. 962, and the government relies upon the case of The Western Maid, 257 U. S. 419, 42 Sup. Ct. 159, 66 L. Ed. 299, decided January 3, 1922. There is no inconsistency between these two cases. In the first the Lake Monroe was assigned by the United States Shipping Board, through the Emergency Fleet Corporation as agent, to a Boston firm as operating agent, and at the time of the collision, October 8, 1918, she was carrying a cargo of coal coastwise for a private concern. The court held that the steamer was employed "solely as a merchant vessel" and subject to arrest under section 9 of the Act of September, 1916, 39 Stat. 728, 730 (Comp. St. 1918, Comp. St. Ann. Supp. 1919; § 814e), which provides:

"That any vessel purchased, chartered, or leased from the board may be registered or enrolled and licensed, or both registered and enrolled and licensed, as a vessel of the United States and entitled to the benefits and privileges appertaining thereto: Provided, that foreign-built vessels admitted to American registry or enrollment and license under this act. and vessels owned, chartered, or leased by any corporation in which the United States is a stockholder, and vessels sold, leased, or chartered to any person a citizen of the United States, as provided in this act, may engage in the coastwise trade of the United States.

"Every vessel purchased, chartered, or leased from the board shall, unless otherwise authorized by the board, be operated only under such registry or enrollment and license. Such vessels while employed solely as merchant vessels shall be subject to all laws, regulations, and liabilities governing merchant vessels, whether the United States be interested therein as owner, in whole or in part, or hold any mortgage, lien, or other interest therein."

The Western Maid was owned by the United States, allocated by the United States Shipping Board to the War Department for service as a transport. At the time of the collision, January 10, 1919, she was manned by a Navy crew and was carrying a cargo of foodstuffs for relief of the civilian population of Europe. March 20, 1919, she was redelivered to the United States Shipping Board, and the libel was filed November 8, 1919.

Two questions were involved: First, was the Western Maid employed solely as a merchant vessel at the time of the collision? Second, if not, was she subject to a lien, enforceable by arrest after she had been redelivered to the Shipping Board, provided the United States was at fault for the collision?

Mr. Justice Holmes, delivering the opinion of the court, held on the first question that the steamer was not employed solely as a merchant vessel, saying:

"It is suggested that the Western Maid was a merchant vessel at the time of the collision, but the fact that the food was to be paid for and the other details adverted to in argument cannot disguise the obvious truth that she was engaged in a public service that was one of the constituents of our activity in the war and its sequel, and that had no more to do with ordinary merchandizing than if she had carried a regiment of troops."

290 F.—37

On the second question the court held that the vessel herself was not subject to a lien as a guilty thing because of any negligence during the government's operation of her. Mr. Justice Holmes said:

"It may be said that the person who actually did the act complained of may or might be sued and that the ship for this purpose is regarded as a person. But that is a fiction, not a fact, and as a fiction is the creation of the law. It would be a strange thing if the law created a fiction to accomplish the result supposed. It is totally immaterial that in dealing with private wrongs the fiction, however originated, is in force. See Liverpool, Brazil & River Plate Steam Navigation Co. v. Brooklyn Eastern District Terminal, 251 U. S. 48, 53. The personality of a public vessel is merged in that of the sovereign. The Fidelity, 16 Blatchford, 569, 573; In re State of New York—The Queen City, June 1, 1921."

The minority of the court dissented on the second question only, holding that there was a lien upon the vessel, enforceable after redelivery to the Shipping Board, if the United States was at fault for the collision.

Both the Western Maid and the Norman Bridge were operated by the United States, and neither was subject to arrest after delivery to the Shipping Board unless solely employed as a merchant vessel. If the Western Maid, carrying food after the war was over for the relief of European civilians suffering as a result of it, was not so employed, I cannot see that the Norman Bridge, of which the United States was owner pro hac vice, and carrying fuel to enable one of its associate belligerents to continue the war, was so employed. The language of Mr. Justice Holmes seems to me quite as applicable to it. Therefore I think the government's exception to the jurisdiction is good as to the Nitonian's libel.

[2] At the trial the claimants of the Nitonian moved to amend their answer to the government's libel by pleading the collision damage, sustained by her, as a set-off. The government objected on the ground that it was too late to do this under section 5 of the Act of March 9, 1920, 41 Stat. 526, which reads:

"That suits as herein authorized may be brought only on causes of action arising since April 6, 1917: Provided that suits based on causes of action arising prior to the taking effect of this act shall be brought within one year after this act goes into effect; and all other suits hereunder shall be brought within two years after the cause of action arises."

[3] But I read this section as applying only to a suit brought against the United States, which a set-off in a suit brought by the United States is not. The government, by bringing suit, subjected its claim to any proper set-off. The Siren, 7 Wall. 152, 19 L. Ed. 129, as to which case Mr. Justice Holmes said in The Western Maid:

"But it is said that the decisions have recognized that an obligation is created in the case before us. Legal obligations that exist, but cannot be enforced, are ghosts that are seen in the law, but that are elusive to the grasp. The leading authority relied upon is The Siren, 7 Wall. 152. The ground of that decision was that when the United States came into court to enforce a claim it would be assumed to submit to just claims of third persons in respect of the same subject matter. 7 Wall. 154. Carr v. United States, 98 U. S. 433, 438. In reaching its result the court spoke of such claims as unenforceable liens, but that was little more than a mode of expressing the consent of the sovereign power to see full justice done in such

circumstances. It would have been just as effective and more accurate to speak of the claims as ethical only, but recognized in the interest of justice when the sovereign came into court. They were treated in this way by Dr. Lushington in The Athol, 1 Wm. Rob. 374, 382."

The motion to amend the Nitonian's answer will therefore be granted.

[4] Coming now to the merits: At the time of the collision the convoy consisted of nine columns of steamers in four tiers abreast. The British warship Columbella was the first steamer in the fifth column, numbered from the port side of the convoy, and she was the guide, the Nitonian being the first steamer behind her, while the Norman Bridge was the fourth and last steamer of the fourth column. The speed of the convoy was 9½ knots, and the Columbella signaled the steamers from time to time to zigzag away from and back to the main or base course, in accordance with numbered diagrams furnished to each steamer. The time for beginning, maintaining, and changing every such course was fixed by a zigzag clock giving Greenwich mean time synchronized every day by signal from the guide ship.

It is conceded by both parties that the wind was light, the sea smooth, and the moonlight so bright that vessels could be seen for more than a mile away. The steamers in each column were to maintain a distance of two cable lengths between each other and of four cable lengths between the columns. A cable, as a measure of length, is 600 feet, or about one-tenth of a nautical mile, whereas, as a cable, it may be of any length—100 fathoms, 120 fathoms, etc.

It is admitted that the Nitonian for lack of speed dropped astern out of her station in her own column, but her witnesses say that she maintained her distance from the fourth column, while the witnesses of the Norman Bridge say that she was also to the westward of her station in respect of that column. At the time of the collision the convoy was on zigzag course No. 56, which called for 10 minutes on the main or base course at the beginning and end of each hour and for 20 minutes each on two zigzags of 40 degrees from and of 40 degrees back to the main or base course.

The pleadings of the Norman Bridge say that the Nitonian, when on a port zigzag back to the mean course, was but a ship's length away on her starboard beam and steering for her starboard side; that, the collision being then imminent, the Norman Bridge blew one blast and put her helm hard aport, so as to swing her stern away from the Nitonian. The pleadings of the Nitonian, on the contrary, say that the Norman Bridge, instead of taking a course back to the mean course under a starboard helm, closed in on the Nitonian under a port helm, whereupon the Nitonian put her helm over hard aport, blew one blast, and stopped and reversed her engines.

These two vessels should have been proceeding parallel with each other, but one must have steered on a course directly opposite to the course agreed upon, and it is impossible to reconcile the testimony of the witnesses on this point. But it is perfectly clear that neither maneuvered with reference to the other until the collision was imminent. It is common knowledge that there is always danger of the ves-

sels in a convoy getting out of their station and interfering with each other, and lookouts were required, and were kept, not only forward, but astern. If the vessels were in columns 2,400 feet apart, as the Nitonian alleges, when they began to return to the mean course on a starboard helm, it seems clear that they had abundant time to prevent collision by proper signals; while if, as the Norman Bridge contends, the Nitonian was then on a parallel course only a ship's length away, it is obvious that a more vigilant lookout should have been kept, and that the lookout kept on each vessel was insufficient. The Circuit Court of Appeals of this circuit has decided many collision cases on this ground of insufficient lookout of both vessels, which is particularly applicable to vessels in convoys, because they are all intended to take exactly the same course, and the danger of a departure therefrom is well known and becomes apparent immediately.

I think the Nitonian must have, fallen, not only astern of her station in her own column, but also out of her station in respect to the column on her port side. The most reliable information as to the movements of the vessels is to be expected from the bridge of each, where the steering is done. Observations from forward and aft, especially at night, as to which vessel closed in on the other, are very unreliable; nothing being more common than for those on one vessel to attribute a change of their own course to a change of course on the part of the other. It is an optical illusion that no experience corrects. The testimony of the officers in charge of the navigation of the vessels, respectively, makes it perfectly clear that the collision was imminent when they began to navigate with reference to each other. It is difficult to believe that, after the Norman Bridge had actually steadied on the mean course, she ported away from it and ran into the Nitonian. I adopt the account of the Norman Bridge that she was swinging to port under a starboard helm to get on the mean course, and that the Nitonian was doing the same thing. In view of the nearness of the courses of the vessels, the Nitonian starboarded too soon; yet I think that, if she had continued under the starboard helm, she would have gone clear of the Norman Bridge. Her change to a port helm increased the danger of collision, while the Norman Bridge's change to a port helm tended to swing her stern clear, although it did not accomplish it. When the armed guard at the bow of the Norman Bridge reported to the bridge, the collision was imminent; the report was untimely, and there was no report at all from the stern. That either blew a signal of one whistle is not very satisfactorily proved; but, if either did, it was not heard aboard the other.

Although the Nitonian was more at fault, I think the Norman Bridge contributed to the collision by keeping a most insufficient lookout, and that the United States can recover only the damages, if any, to the Norman Bridge in excess of the damages to the Nitonian.