## CALMAR STEAMSHIP CORP. *v.* UNITED STATES.

No. 262.   Argued January 15, 1953.—Decided April 27, 1953.

*Edwin S. Murphy* argued the cause for petitioner. With him on the brief were *Ira A. Campbell* and *Helen C. Cunningham.*

*Hubert H. Margolies* argued the cause for the United States.   With him on the brief were *Solicitor General Cummings, Assistant Attorney General Baldridge* and *Samuel D. Slade.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.   .

By the Suits in Admiralty Act[1] the United States consents, under defined conditions, to the filing against

---

[1] Section 1 of the Act reads as follows:

"No vessel owned by the United States or by any corporation in which the United States or its representatives shall own the entire

it in the District Courts of libels *in personam*. Libels which concern vessels "operated by or for the United States" and "employed as merchant vessels" are authorized. The question in this case is whether a privately owned steamship, undoubtedly "operated . . . for the United States," was "employed as a merchant vessel" within the meaning of the Act while carrying military supplies and equipment for hire. Since a considerable volume of litigation appears to be affected, we granted certiorari, 344 U. S. 853, on a petition which the Government did not oppose.

The vessel here, the S. S. *Portmar*, and the voyage are those involved in No. 303, *Calmar Steamship Corp.* v. *Scott, ante,* p. 427, which was tried together with this suit. Calmar's claim against the United States is for additional charter hire and for the loss of its vessel. The latter claim is based on two theories. The United States,

outstanding capital stock or in the possession of the United States or of such corporation or operated by or for the United States or such corporation, and no cargo owned or possessed by the United States or by such corporation, shall, in view of the provision herein made for a libel in personam, be subject to arrest or seizure by judicial process in the United States or its possessions: *Provided,* That this chapter shall not apply to the Panama Railroad Company." 41 Stat. 525, 46 U. S. C. § 741.

Section 2 provides:

"In cases where if such vessel were privately owned or operated, or if such cargo were privately owned and possessed, a proceeding in admiralty could be maintained at the time of the commencement of the action herein provided for, a libel in personam may be brought against the United States or against any corporation mentioned in section [1] of this title, as the case may be, provided that such vessel is employed as a merchant vessel or is a tugboat operated by such corporation. Such suits shall be brought in the district court of the United States for the district in which the parties so suing, or any of them, reside or have their principal place of business in the United States, or in which the vessel or cargo charged with liability is found. . . ." 41 Stat. 525, 46 U. S. C. § 742.

it is said, is liable as an insurer to the extent that war-risk insurance purchased pursuant to the provisions of Article 2.17 of the charter [2] does not cover the loss. The United States is also liable, Calmar contends, because the loss of the *Portmar* was a result of compliance by its master with orders issued under authority of the United States, and the latter agreed in Article 2.11 of the charter [3] to hold the owners harmless from all consequences of such compliance.

Other relevant provisions of the charter are as follows: The "good steel steamship *Portmar* . . . with hull, machinery and equipment in a thoroughly efficient state" was chartered "for trading for one round voyage." Calmar agreed to deliver the *Portmar* to the United States "ready to receive cargo with clean-swept holds and . . . tight, staunch, strong and in every way fitted for service" and manned by "a Master and a full complement of officers and crew for a vessel of her tonnage." Calmar was to exercise due diligence "to maintain [the vessel]

---

[2] "ARTICLE 2.17. The Owner may provide, and the Charterer shall pay for, or, if the Charterer shall so elect and give notice of such election to the Owner at or prior to the date of delivery of the Vessel . . . the Charterer shall provide . . . insurance on the Vessel, which shall be made payable to the Owner . . . under full form of . . . war risk policies . . . .

"The Vessel shall not be required to sail on any voyage until the insurance contemplated by this Article has been placed by the Owner or provided or assumed by the Charterer, as the case may be, provided, however, that written or telegraphic notice of assumption by the Charterer shall be sufficient."

[3] "ARTICLE 2.11. Subject always to the direction of the Charterer, the Master shall prosecute his voyages with the utmost dispatch . . . .

"The Charterer shall indemnify and hold harmless the Owner, the Master and the Vessel from all consequences and liabilities whatsoever arising from compliance with any orders or directions of the Charterer or its agents, given pursuant to this Article or any other Article of this Charter."

in such state during the currency of this Charter." The *Portmar* was to be employed, the charter further provided, "in carrying lawful merchandise, including petroleum or its products in proper containers, between safe ports or places, in lawful trades within the trading limits of this Charter, as the Charterer or its agents shall direct." Hire was to be payable, "in the case of a constructive total loss, to the time of the casualty resulting in such constructive total loss." Otherwise hire was due for periods during which the vessel was prevented from working by damage resulting from warlike acts or caused by the fault of the United States. The wages of the Master, officers and crew were to be paid by Calmar. Drydocking, cleaning and painting expenses were likewise to be borne by Calmar. "The Master (although appointed by the Owner) [was to] be under the orders and directions of the Charterer as regards employment, agency, and prosecution of the voyages; and Charterer [was to] load, stow, trim and discharge the cargo at its expense under the supervision of the Master, who [was] to sign bills of lading for cargo as presented . . . . The Master, officers and crew of the Vessel in supervising loading, stowing, trimming, tallying and discharging, [were to] be deemed the agents of the Charterer, except in so far as such supervision pertain[ed] to the safety of the Vessel." Calmar agreed to investigate complaints of the United States against the Master, officers and crew and make necessary changes in appointments. Finally, the charter specifically provided that "[n]othing herein stated is to be construed as a demise of the Vessel to the Charterer."

The District Court found that the *Portmar*

"was privately owned and operated for the profit of the owner, in charge of à master and crew, selected and employed by the owner and responsible to it alone. That the cargo was public stores and muni-

tions did not render 'public' the character of the vessel. She was owned neither absolutely nor *pro hac vice* by the United States. Public service did not alter the merchant character of the vessel . . . ." 103 F. Supp. 243, 263.

Consequently the District Court assumed jurisdiction under the Suits in Admiralty Act. It awarded Calmar a decree against the United States for $238.50 due, in addition to the charter hire paid by the Government, as reimbursement for expenses incurred prior to February 19, 1942, when the *Portmar* was damaged and abandoned.[4] But the court held against Calmar on the merits of the latter's claim for charter hire for the period following that date. It held also that the United States was not on any theory liable for the loss of the vessel. *Id.,* at 269.

The Court of Appeals reversed. While, it said, the *Portmar* could, indeed, under its charter, have been employed as a "merchant vessel" in foreign commerce, the cargo she in fact carried indicated that she was not so employed. For her load consisted entirely of "war materiel." She carried military supplies and equipment, ammunition, and high-octane gasoline for use in war planes. A ship "while so employed," that is, while carrying such cargo, the court held, is not "employed as a merchant vessel." This was said to have been "abundantly established" by *The Western Maid,* 257 U. S. 419, and by *Bradey* v. *United States,* 151 F. 2d 742, *United States* v. *City of New York,* 8 F. 2d 270, and *The Norman Bridge,* 290 F. 575, and to have been "at least recognized" in *United States Grain Corporation* v. *Phillips,* 261 U. S. 106. 197 F. 2d 795, 801–802.

---

[4] The Government's appeal to the Court of Appeals from the decree of the District Court was restricted to the jurisdictional issue, and the Government has not intimated that the award of $238.50 to Calmar was in error on the merits.

In reaching its conclusion, the Court of Appeals adopted the Government's position below. In this Court, the Government changed its tune. Mildly suggesting that the view it pressed on the Court of Appeals "has some support," the Government urges now "that the view that jurisdiction existed under the Suits in Admiralty Act is better grounded." The cases relied on by the Court of Appeals, the Government now argues, dealt with a significantly different problem than arises under the Suits in Admiralty Act and do not support the conclusion that the nature of the cargo is a necessary criterion for determining whether a privately owned vessel is "employed as a merchant vessel" within the terms of that Act. The language of the Act does not impose this criterion. The phrase, "employed as a merchant vessel," the Government now contends, is more appropriately read to refer simply to privately owned vessels operated for the United States for hire. Such a reading is not inconsistent with the legislative history, and, unlike that adopted by the Court of Appeals, tends to regard the Suits in Admiralty Act and its sister statute, the Public Vessels Act, 43 Stat. 1112, 46 U. S. C. § 781, which permits suits "for damages caused by a public vessel of the United States," [5] as manifestations of a single larger purpose, jointly forming a rational system free of random omissions and exceptions. Moreover, the Government points out, a test under which the arrangements effectuated by a charter-party are the controlling facts lends

---

[5] Section 1 of the Act provides:

"A libel in personam in admiralty may be brought against the United States . . . for damages caused by a public vessel of the United States, and for compensation for towage and salvage services, including contract salvage, rendered to a public vessel of the United States: *Provided,* That the cause of action arose after the 6th day of April, 1920." 46 U. S. C. § 781.

itself, unlike the cargo test, to simple and expeditious application, reasonably predictable in result. We agree with the Government's position here.

*The Western Maid, supra,* dealt with attempts to bring in the District Courts "proceedings *in rem* for collisions that occurred while the vessels libeled were owned, absolutely or *pro hac vice,* by the United States, and employed in the public service." 257 U. S., at 429. The *Western Maid* itself was government property. The *Liberty* and the *Carolinian,* the other two vessels involved, were, at the time of the collisions, operated by the United States under bareboat charters. The *Carolinian* was an army transport manned by an army crew. The *Liberty* was commissioned and employed as a naval dispatch boat, manned, of course, by a navy crew. The *Western Maid* served as a transport. She carried foodstuffs for European relief, which, if not distributed in what had been enemy territory, were to be sold by the appropriate government official. But while, as we have noted, all three vessels were in government hands at the time of the collisions on which the libels were based, at the time of suit the *Carolinian* and the *Liberty,* though not the *Western Maid,* were privately owned. And so the principal question in the case, "[t]he only question really open to debate," *id.,* at 432, to which Mr. Justice Holmes, for the Court, addressed himself, was whether an enforceable liability could have been created when those two vessels passed into private ownership, although no such liability arose when the collisions occurred. The *Western Maid,* it was claimed, although publicly owned, was employed "solely" as a merchant vessel, and hence as to it the collision at the time it occurred gave rise to a liability enforceable against the United States by virtue of the Shipping Act of 1916 as construed, a liability enforceable *in rem* and subjecting the

vessel to seizure.[6]   It was this contention, on these facts, under this Act so construed, that Mr. Justice Holmes disposed of in passing by stating "the obvious truth, that [the *Western Maid*] was engaged in a public service that

---

[6] Section 9 of the Shipping Act of 1916, 39 Stat. 728, 730, as amended, 40 Stat. 900, 41 Stat. 994, 49 Stat. 1987, 2016, 52 Stat. 964, 46 U. S. C. § 808, provides in part:

"Every vessel purchased, chartered, or leased from the [United States Maritime Commission] shall, unless otherwise authorized by the [commission], be operated only under such registry or enrollment and license.   Such vessels while employed solely as merchant vessels shall be subject to all laws, regulations, and liabilities governing merchant vessels, whether the United States be interested therein as owner, in whole or in part, or hold any mortgage, lien, or other interest therein."

*The Lake Monroe,* 250 U. S. 246, permitted seizure, under the provision just quoted, "of a steam vessel . . . owned and operated by the Government of the United States," 250 U. S., at 248.   We have said that the Suits in Admiralty Act "was passed to avoid the embarrassment to which the Government found itself subjected by the Act of September 7, 1916, c. 451, 39 Stat. 728, by the ninth section of which vessels in which the United States had an interest and which were employed as merchant vessels were made liable as such to arrest or seizure for enforcement of maritime liens.   *The Lake Monroe,* 250 U. S. 246."   *Blamberg Bros.* v. *United States,* 260 U. S. 452, 458.   Congress, in passing the Suits in Admiralty Act, was not unmindful of the considerations of fairness which prompted passage of the Shipping Act of 1916, and later of the Public Vessels Act.   Congress compensated for the prohibition against seizures in § 1 of the Suits in Admiralty Act with the waiver of immunity in § 2.   Section 1 states: "No vessel owned . . . shall, in view of the provision herein made for a libel in personam, be subject to arrest . . . ."   See *supra,* n. 1.   Surely the considerations of fairness which have weighed with Congress in all its actions in this field indicate that, for want of valid reasons to the contrary, the prohibition of § 1 and the waiver of § 2 and of the Public Vessels Act should be more or less coextensive.   We do not in any way imply that this attitude of fairness can decide concrete cases, or that Congress meant it to.   But it points a direction.

was one of the constituents of our activity in the war and its sequel and that had no more to do with ordinary merchandizing than if she had carried a regiment of troops." *Idem.*

Of the other cases relied on by the Court of Appeals, *The Norman Bridge, supra,* like *The Western Maid,* involved an attempted seizure under the Shipping Act of 1916. The vessel was owned by the United States *pro hac vice. United States* v. *City of New York, supra,* arose under the Suits in Admiralty Act, but the vessel in question was owned by the United States and engaged in public business. She was in no sense operated for hire. The vessel in *Bradey* v. *United States, supra,* was also owned by the United States and in no sense operated for hire. *United States Grain Corporation* v. *Phillips, supra,* did not concern the Suits in Admiralty or Public Vessels or Shipping Acts. It was a suit by a naval officer under an ancient statute for a commission on gold carried by the destroyer he commanded. The citation by the Court in *Phillips* of *The Western Maid* was apt, but it fails to render the *Phillips* case an apt citation here.

The United States today would be subject to suit on the facts of *The Western Maid* under the Public Vessels Act. But a vessel operated for, or owned by, the United States cannot now, by virtue of § 1 of the Suits in Admiralty Act, be seized, whether or not she was "employed as a merchant vessel." It is for that reason that construction of the phrase, "employed as a merchant vessel," presented a materially different problem under the Shipping Act of 1916 than it does under the Suits in Admiralty Act. Nor is the problem the same when a vessel owned, absolutely or *pro hac vice,* by the United States is involved as when one privately owned and operated is in question. In the former case the consequence of holding that a vessel was not "employed as a merchant vessel"

is, in the great number of instances, that the libel is dismissed under the Suits in Admiralty Act only to be heard under the Public Vessels Act in the same admiralty court. When as here the vessel is privately owned and operated, however, to hold that she was not employed as a merchant vessel is to relegate the libelant, on a contract claim substantial enough not to be cognizable on the law side under the Tucker Act, 28 U. S. C. (Supp. III) § 1346, to the Court of Claims.[7] Yet the District Courts are, in our judicial system, the accustomed forum in matters of admiralty; everything else being equal, no efforts should be made to divert this type of litigation to judges less experienced in admiralty. The Suits in Admiralty Act and the Public Vessels Act are not to be regarded as discrete enactments treating related situations in isolation. Hence there is no reason why a claim arising in connection with a vessel bareboat chartered by the United States and carrying war materiel should be heard by a District Court, while a like claim relating to a vessel chartered as was the *Portmar* and carrying the same type of cargo, should

---

[7] 28 U. S. C. (Supp. III) § 1491. The litigant cannot hedge by filing a suit in the Court of Claims simultaneously with one under the Suits in Admiralty Act, as he might well want to do because of the uncertainties inherent in the cargo test applied by the Court of Appeals. (The owner, as was true in this case, may not know the nature of the cargo. The manifest here was secret. The vessel may carry mixed cargo, or it may, between voyages, be without cargo.) 28 U. S. C. (Supp. III) § 1500 provides that the "Court of Claims shall not have jurisdiction of any claim . . . in respect to which the plaintiff or his assignee has pending in any other court any suit . . . against the United States . . . ." Time limitations differ under the Suits in Admiralty Act and in the Court of Claims. The limitation is two years under the former, 41 Stat. 526, 46 U. S. C. § 745, and six years in the latter, 28 U. S. C. (Supp. III) § 2501. The starting points for accrual of interest vary as well. Compare 41 Stat. 526, 46 U. S. C. § 745, with 28 U. S. C. (Supp. III) § 2516; see *De La Rama S. S. Co.* v. *United States,* 344 U. S. 386, 390.

require an action to be filed in the Court of Claims.[8]  Nor is there any reason why a collision involving the one vessel should result in an admiralty suit under the Public Vessels Act, while on the same facts, recovery in the case of the other vessel should have to be sought on the law side.[9] We have no authoritative indication that Congress wished such results, and it is quite another thing for us, in the absence of guidance from Congress, to assume that it did.

We hold that the *Portmar,* a privately owned vessel operated for hire for the United States, was "employed as a merchant vessel" within the meaning of the Suits in Admiralty Act, although engaged on a war mission.  We do not consider the merits of Calmar's claims against the United States, which the Court of Appeals did not, in view of its disposition of the libel, pass on.

The judgment of the Court of Appeals must be vacated and the cause remanded to that court for proceedings not inconsistent with this opinion.  *It is so ordered.*

---

[8] It is not to be assumed that all claims sounding in contract can form the basis of a suit under the Public Vessels Act.  The Act expressly authorizes towage and salvage claims.  We intimate no opinion as to other claims, and do not suggest that all or any of the causes of action in this very suit would or would not qualify under the Public Vessels Act.  There are cases in which jurisdiction over contract claims other than towage or salvage has been assumed. *Thomason* v. *United States,* 184 F. 2d 105; *United States* v. *Loyola,* 161 F. 2d 126.  But cf. *Eastern S. S. Lines* v. *United States,* 187 F. 2d 956.  All that matters for our purpose is that there is a class of cases, no matter how narrow, which, if the cargo test of jurisdiction is applied, will be heard by the District Courts in admiralty when a vessel owned by the United States is involved, and in the Court of Claims when the vessel was chartered as was the *Portmar.*  It is not our task, of course, to torture the Suits in Admiralty and Public Vessels Acts into an all-inclusive grant of jurisdiction to the District Courts.  But equivocal language should be construed so as to secure the most harmonious results.

[9] Suit would lie in most instances under the Tort Claims Act, 60 Stat. 842.