**WESTERN TANKERS CORPORATION,**
a corporation, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

**No. 73 Civ. 5492–LFM.**

United States District Court,
S. D. New York.

Jan. 22, 1975.

Graham & James, Long Beach, Cal., and Darby, Healey & Stonebridge, New York City, for plaintiff; Don A. Proudfoot, Jr., Long Beach, Cal., of counsel.

Paul J. Curran, U. S. Atty., for the Southern District of New York, New York City, for defendant; Gilbert S. Fleischer and Terence Gargan, New York City, of counsel.

## OPINION

MacMAHON, District Judge.

In the early morning hours of December 11, 1971, the SS WESTERN COMET ("the tanker"), on charter to the Military Sea Lift Command, Department of the Navy, was berthed alongside a NATO terminal at Sari Saki, Turkey, discharging fuel oil, when strong winds started blowing. Chief Mate George Perry, observing that a mooring line had parted, went to the forecastle to adjust the lines and sustained severe brain injuries[1] when he was struck on the head by a parting line.

---

1. Perry's injuries have been diagnosed as an organic brain syndrome with psychiatric overlay. Stenographer's Minutes, at 16–17.

Perry brought an action against plaintiff Western Tankers Corporation, in the Superior Court of California, alleging negligence under the Jones Act and unseaworthiness. Plaintiff settled Perry's action and brought this third-party action against the United States, as charterer of the tanker, alleging breach of the "safe berth" clause of the charter party and seeking full indemnity for the amount paid in settlement of Perry's claim and the expenses incurred in that action.

The "safe berth" clause of the charter party provides, in pertinent part:

"The Vessel shall load and discharge at a safe place or wharf designated by the Charterer to which she can proceed, lie at, and depart from always safely afloat."

This action was tried by the court, without a jury. Plaintiff claims that the United States breached the safe berth clause because the designated berth was too short to accommodate the entire vessel and also because a lead line could not be tied from the bow to the pier because the pier had no forward bollard.[2]

Relying on Venore Transp. Co. v. Oswego Shipping Corp., 498 F.2d 469 (2d Cir. 1974), plaintiff first contends that it is entitled to full indemnity for damages arising from the charterer's breach of the safe berth warranty because the master of the tanker, Captain Davis, had no prior knowledge that the berth was unsafe, nor did he hinder, hamper, mislead or prevent the charterer from performing its obligation to furnish a safe berth.

Defendant contends that it is not liable for indemnity because Perry's injuries were not caused by an unsafe berth but solely by the intervening negligence of plaintiff's vessel. Plaintiff counters that the negligence of the vessel, if any, is immaterial because the accident would have happened any way due to the unsafe berth.

We turn now to a consideration of the evidence in light of the parties' contentions.

■ It is undisputed that on December 9, 1971, when the tanker moved into its designated berth, the master discovered that the pier was too short to accommodate the entire vessel because the inshore end of the berth was too shallow. In addition, there was no forward bollard on the pier, making it impossible for the crew properly to secure the vessel to the pier by tying a lead line forward from the bow of the vessel. We think there can be no question that such a berth is unsafe and that the government breached its warranty to provide a safe place or wharf where the tanker could lie "always safely afloat."

The uncontested testimony of Captain Davis is that before entering the berth he had no knowledge of its unsafe conditions and that, as soon as practicable[3] after discovering them, he protested orally to a naval lieutenant and to a NATO representative. Nevertheless, Davis decided to unload and ordered the crew to secure the vessel by tying seven polypropylene lines to the bollards located on each side of the tanker and by bringing short lead lines from the bow back to the bollards.

During the early morning hours of December 11, 1971, heavy winds began to blow, but with intermittent periods of calm. The tanker, continuing to unload,

2. A bollard is a thick, low post, usually of iron or steel, mounted on a wharf to which mooring lines from vessels are attached.

3. Defendant contends that plaintiff is precluded from recovering indemnity or contribution because it failed to comply with Clause 32(n) of the charter party, which provides, in pertinent part, that "[t]he Owner shall, as far as may be practicable, keep the Charterer . . . currently informed in writing as to any oral orders . . . involving . . . risk to the Vessel. . . ." We reject that contention, since written notice was impracticable under the circumstances existing at the time of the discovery of the unsafe condition and, in any event, would have served no useful purpose since the master's testimony as to oral notice stands uncontradicted.

was rising out of the water a foot every hour as the fuel oil was discharged. Captain Davis was on deck during the first hours of the 0400 to 0800 watch and talked with Perry about the danger of the vessel's breaking away from her moorings. Nevertheless, during a calm, Davis went below to sleep, leaving Perry in charge of slacking off the lines.

Davis testified that he left a full watch of three men on deck, but the vessel's log shows that only one man was on deck. In any event, Davis admitted that even four men would not have been enough properly to slack off the seven lines under the conditions.

A log entry by second mate Grossman described the mooring lines as so taut at the time of the accident that they were almost straight up and down. Grossman also reported that before the accident he had asked Perry to order the crew to slack off the lines, but that Perry had refused. The log sheets of December 10 and 11, 1971 also show that some of the crew members were working successive watches.[4]

■ Considering the totality of this evidence, we conclude that the vessel was negligent because she was neither adequately manned, nor were her mooring lines slacked off properly.

## CAUSATION

We must next consider whether the accident and injuries which Perry sustained were caused solely by defendant's negligence, solely by plaintiff's negligence or by the concurrent negligence of both.

The government admits that it failed to provide a safe berth but contends that the master's failure to man the tanker adequately or to slack off the mooring lines was an intervening cause of the accident, relieving defendant from liability. Plaintiff responds that any negligence on its part was of no significance because the lines would have snapped under the force of the wind, even if they had been slacked off properly. In support of this contention, plaintiff points to the fact that the stern of the tanker was jutting far out beyond the pier, her sides were raised high above the dock, and her bow was not tied fast to the pier for lack of a forward bollard.

The simple "but for" test shows that neither of the contentions has merit. The incontrovertible evidence shows that but for the unsafe berth the accident would not have happened. By the same token, the uncontradicted testimony of defendant's expert, civil engineer Schnitzer, was that, despite the lack of a forward bollard, the force of the wind alone, acting on the exposed tanker, would not have been great enough to break the lines. Accepting that testimony, the accident would not have happened but for the vessel's negligence in not properly slacking off the lines.

■ We conclude that the negligence of the vessel, in failing to slack off the lines, and of the government, in providing an unsafe berth, were the concurrent causes of Perry's accident.

## INDEMNITY

Plaintiff contends that under *Venore Transp. Co. v. Oswego Shipping Corp., supra,* it is entitled to full indemnity because the master of the vessel neither knew that the berth was unsafe before entering it, nor did the crew in any way hinder, hamper, mislead or prevent the charterer from performing its obligation to furnish a safe berth.

In *Venore,* a vessel was damaged when she collided with a pier due to a breach of a voyage charterer's non-delegable duty to provide a safe berth. The court held that the voyage charterer was liable in full to the time charterer absent negligence on the part of the time charterer. We think *Venore* inapplicable here.

■ Plaintiff is not seeking indemnity for damage to its vessel but for set-

---

4. See, *e. g.*, Captain Davis's admission that officer Haines had stood the 2000 to 2400 watch on December 10, 1971 and the 0000 to 0400 watch on December 11, 1971.

tlement of Perry's claim for personal injuries. The applicable authorities, we think, are not those involving damage to vessels but those involving a claim over against a third party for indemnity for breach of warranty where a shipowner has been held liable to a seaman for personal injuries caused by negligence or unseaworthiness.[5] Those authorities teach that, once the shipowner's negligence has been found to have been a contributing cause of the accident, we must decide whether the shipowner's negligence was sufficiently serious to preclude indemnity.[6] Here, that test requires a determination of whether Captain Davis, as plaintiff's agent in charge, was best situated to adopt preventive measures and thereby reduce the likelihood of injury to the crew from the dangers caused by the unsafe berth.[7]

As soon as the master discovered that the berth was unsafe, he had the right, under Clause 42[8] of the charter party, to leave the berth. After the master had elected to stay, he could have minimized the likelihood of personal injury to the crew by making sure that the tanker was adequately manned to slack off the lines as the ship rose, and, even after the lines broke he could have reduced the peril by calling for tugboats to secure the tanker rather than allow an inadequate crew to attempt adjustment of the overtaut lines.

■ We find, therefore, that the tanker failed to take the necessary preventive measures to reduce the likelihood of injury to the crew from the dangers of the unsafe berth and conclude that plaintiff was sufficiently negligent to preclude it from recovery of indemnity from defendant.

## CONTRIBUTION

■ Under maritime personal injury law, a defendant can seek contribution from a third party for breach of warranty, provided the third party is not immunized from suit by the person injured.[9] Neither plaintiff nor the United States was immunized from suit by Perry.[10] Contribution here is, therefore, appropriate.[11] When contribution

5. Hurdich v. Eastmount Shipping Corp., 503 F.2d 397 (2d Cir. 1974).

6. Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S.Ct. 438, 2 L. Ed.2d 491 (1958); Hurdich v. Eastmount Shipping Corp., *supra*, 503 F.2d at 401.

7. This test was developed in the context of indemnification under implied warranty of workmanlike service in maritime contracts. See Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964); Hurdich v. Eastmount Shipping Corp., *supra*, 503 F. 2d at 401. There is no reason why this test should not be used in maritime cases involving breach of an express warranty which results in personal injuries, such as the express warranty to designate a berth. See also, DeGioia v. United States Lines Co., 304 F.2d 421, 426 (2d Cir. 1962): "The function of the doctrine of unseaworthiness and the corollary doctrine of indemnification is allocation of the losses caused by shipboard injuries to the enterprise . . . to the institution or institutions most able to minimize the particular risk involved."

8. Clause 42(a) of the charter party provides, in pertinent part: "In any situation what-

soever . . . which in the judgment of the Owner or Master is likely . . . to make it unsafe . . . to enter or discharge the cargo . . . the Vessel may proceed or return, directly or indirectly, to or stop at any such port or place whatsoever as the Master or the Owner may consider safe or advisable under the circumstances. . . ."

9. Cooper Stevedoring Co. v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974); Hurdich v. Eastmount Shipping Corp., *supra*.

10. Since the vessel was being operated by Western Tankers for the United States, as time charterer, and was carrying its oil, Perry could have sued the United States under the Suits in Admiralty Act, 46 U.S.C. § 741 et seq., for his personal injuries due to the unseaworthiness of the vessel, even though she was manned, equipped and maintained by the owner. Pineiro v. United States, 65 F.Supp. 191 (N.D.Cal.1945). *Cf.* Calmar S.S. Corp. v. United States, 345 U.S. 446, 73 S.Ct. 733, 97 L.Ed. 1140 (1953); 2 Norris, The Law of Seamen § 635 at 219–225 (1970).

11. We find that plaintiff did not waive its right to contribution even though it failed to

is found to be appropriate in maritime personal injury cases, damages are awarded equally between the parties, regardless of the relative degree of fault.[12]

A shipowner can seek indemnity or contribution from a third party liable over for breach of warranty where the shipowner has paid to settle a personal injury action brought by its seaman employee, provided (1) the seaman was injured on the shipowner's vessel, (2) the shipowner was potentially liable to the seaman and (3) the amount paid in settlement is reasonable.[13]

Plaintiff clearly established that Perry was severely injured on its vessel and that it faced potential liability for negligence and unseaworthiness. We think that the $150,000 paid by plaintiff in settlement of Perry's claim was reasonable under the circumstances.

The settlement was not a merely voluntary act but a sound compromise of a substantial claim. The California judge held an extensive pretrial conference and not only discussed the case thoroughly with attorneys for both parties but also interviewed Perry. He estimated that a jury would return a verdict for Perry, ranging from $50,000 to $500,000, and recommended settlement in the amount of $150,000. Both parties agreed in what were obviously arms' length negotiations.

Consequently, we find that plaintiff is entitled to contribution in the amount of $75,000, representing fifty per cent of the $150,000 settlement of Perry's claim. Plaintiff is not entitled, however, to contribution for legal fees and other expenses incurred in obtaining settlement of Perry's claim. Plaintiff would have had to incur those expenses in any event to defend against the claim under the Jones Act and the maritime claim for unseaworthiness.[14]

Accordingly, we grant plaintiff contribution in the amount of fifty per cent of Perry's settlement.

The foregoing opinion constitutes this court's amended and supplemental findings of fact and conclusions of law, in accordance with Rule 52, Fed.R.Civ.P. To the extent that the findings of fact and conclusions of law, made orally at the conclusion of trial on October 11, 1974, are different or inconsistent with those made here, they are vacated or modified accordingly.

Settle a judgment within fifteen (15) days.

claim contribution in its complaint. See, Sessions v. Fritz Kopke, Inc., 479 F.2d 1041 (5th Cir. 1973), aff'd sub nom., Cooper Stevedoring Co. v. Fritz Kopke, Inc., 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694 (1974) ; Hurdich v. Eastmount Shipping Corp., *supra*. Nor did such failure prejudice defendant in the defense of its case.

12. See Hurdich v. Eastmount Shipping Corp., *supra*, 503 F.2d at 403, in which the court specifically accepted Judge Lasker's interpretation of In re Seaboard Shipping Corp., 449 F.2d 132 (2d Cir. 1971), as holding that when contribution is found to be appropriate in maritime personal injury cases, damages are divided equally regardless of the relative degree of fault. The Supreme Court, in

Cooper Stevedoring Co. v. Fritz Kopke, Inc., *supra*, did not decide whether contribution should be awarded on the equal division of damages theory or apportioned in accordance with the degree of fault of each party. See Cooper Stevedoring Corp. v. Fritz Kopke, Inc., *supra*, 417 U.S. at 108 n. 3, 94 S.Ct. 2174.

13. Damanti v. A/S Inger, 314 F.2d 395 (2d Cir.), cert. denied, 375 U.S. 834, 84 S.Ct. 46, 11 L.Ed.2d 64 (1963) ; Norris, Maritime Personal Injuries § 64, at 157–162 (2d ed. 1966).

14. Sperry Rand Corp. v. Norddeutscher Lloyd, 1973 AMC 1392, 1402–1403 (S.D.N. Y.) (Lumbard, J.).