Richard Wayne TRAUTMAN, Plaintiff-Appellant,

v.

BUCK STEBER, INC., et al., Defendants,

United States of America, Defendant-Appellee.

No. 81–3220.

United States Court of Appeals, Fifth Circuit.

Dec. 6, 1982.

10. *Id.* at 133 n. 23.

11. *Id.*

Harvey J. Lewis, New Orleans, La., for plaintiff-appellant.

Thomas L. Jones, Torts Branch, Civ. Div., Dept. of Justice, Washington, D.C., for defendant-appellee.

Before GEE and JOHNSON, Circuit Judges, and VAN PELT *, District Judge.

VAN PELT, District Judge:

Appellant Richard Wayne Trautman, a salvage diver employed by a private corporation, was injured while working in the 1974 clearing of the Suez Canal, an operation coordinated by the governments of

_____

* District Judge of the District of Nebraska, sitting by designation.

Egypt and the United States. Appellant brought an action against the United States for these injuries based upon the Suits in Admiralty Act, 46 U.S.C. §§ 741, et seq. and the Public Vessels Act, 46 U.S.C. §§ 781, et seq.

Appellant appeals from the adverse decision of the district court,[1] sitting without a jury and acting within its admiralty jurisdiction, which found that the United States was not liable for appellant's injuries. More specifically, the district court found that (1) the diving barge to which appellant was assigned was not "operated by or for" the United States within the meaning of the Suits in Admiralty Act, 46 U.S.C. § 741, and "accordingly the United States owed no warranty of seaworthiness" to appellant; (2) the United States exercised no operational control over appellant's work and was not responsible for the unsafe diving practices which "resulted in or contributed to" appellant's injury; and (3) the United States, through the Navy doctor assigned to the project and who examined the appellant, was not guilty of maritime medical malpractice. After careful consideration of this case, we affirm the decision of the lower court.

### I.

In order to understand our decision, it is necessary to review the facts of this case. In doing so, we are mindful that:

> In reviewing a judgment of a trial court, sitting without a jury in admiralty, the Court of Appeals may not set aside the judgment below unless it is clearly erroneous. No greater scope of review is exercised by the appellate tribunals in admiralty cases than they exercise under Rule 52(a) of the Federal Rules of Civil Procedure.

*McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954).

In 1974, pursuant to a request by the Egyptian government, the United States agreed in writing to assist that government in the clearing of sunken vessels remaining in the Suez Canal after the 1967 "Six Day War" between Israel and Egypt. The government of Egypt agreed to provide, through its Suez Canal Authority, "all necessary assistance as far as possible to enable the government of the United States to carry out the operation efficiently." In addition, the agreement provided that the United States military and civilian personnel, referred to as "the Force," would be granted immunity from Egyptian criminal jurisdiction.

The United States contracted with Murphy Pacific Marine Salvage Company [Murphy] to perform the salvage operations. As part of this agreement, the United States provided Murphy with two Yard Heavy Lift Craft (seagoing cranes) to assist in the removal of the wrecks. These craft were manned and operated by Murphy personnel.

Murphy entered into a subcontract with Buck Steber, Inc., [Steber] for diving services necessary for removal of the wrecks. The United States had no part in the negotiation or award of this subcontract. Appellant Trautman was one of the divers hired by Steber to carry out its part of the subcontract.

The United States sent a small contingent of civilian and military personnel to monitor the progress and quality of the contractors' performance and to provide liaison between Murphy and the Egyptian government. Captain John H. Boyd, Jr., the officer in charge of the contingent, played no part in the negotiation of the various contracts. Boyd could order changes in the operation if such changes were promptly negotiated between Murphy and those government officials in Washington, D.C. who had contracting authority. One such deviation from the contract occurred when Boyd ordered the stepped up removal of the stern section of one of the wrecks, the Mecca, to allow for the passage of a United States Navy ship. Murphy

---

1. The Honorable Fred J. Cassibry, United States District Judge for the Eastern District of Louisiana.

planned and implemented this special project. Steber and appellant provided the diving work necessary for the removal.

Throughout the general clearance of the canal, Murphy developed the plans for operation which were reviewed by Boyd. The United States, through Boyd, maintained no operational control over the day-to-day operations of Murphy or Steber or their personnel. Steber's orders came directly from Murphy.

Through the liaison provided by Boyd, Murphy acquired from the Suez Canal Authority the use of a diving barge for Steber. Appellant was assigned by Steber to work from this barge.

Appellant arrived in Port Said on May 27, 1974, and began working on the Mecca project on May 29. He was primarily responsible for cutting the hull of the Mecca into sections so that it could be removed by the cranes. The stepped up operation for the removal of the Mecca commenced on June 18, 1974. During the removal of the Mecca, Boyd visited the site on an almost daily basis to monitor the progress of the operation. Other than the initial change of contract order, there is no evidence that Boyd provided any other direction in the aspects of the removal assigned to Steber.

The trial court found that throughout the Mecca project, appellant was subjected by Steber to unsafe diving practices primarily concerning improper decompression procedures. In addition, the court found that these unsafe practices ultimately caused appellant to "develop or aggravated the progression of dysbaric osteonecrosis" (bone death caused by decompression sickness).

The first sign of appellant's injury occurred on August 15, 1974, when he felt pain in his right shoulder after "hand jetting". Hand jetting is a strenuous underwater activity involving the directing of high pressured water to remove mud and sand from around a sunken wreck. The pain in appellant's shoulder persisted and grew worse until on August 31, 1974, when appellant returned to the hotel where the crew was housed and sought help from a person found by the court to be a Murphy paramedic. Appellant was then sent by helicopter to Ismalia for further treatment.

At the Ismalia station there was a Navy medical officer and corpsman to whom the civilian members of the project had access. However, there was no written agreement in which the United States Navy agreed to provide medical services to those civilian members.

Appellant was examined by the medical officer who diagnosed his ailment as a soft tissue injury resulting from strain caused by hand jetting. His shoulder was bound and he was advised to avoid strenuous activity for a week and then return for a checkup. Appellant's shoulder was not X-rayed, possibly because the X-ray machine at the station was inadequate. There is a conflict in the appellant's testimony as to whether he returned to Ismalia for a checkup. Upon return to his assignment on the barge, appellant told the Steber supervisor that his shoulder had improved. However, appellant continued to suffer pain and favor his shoulder through the time he departed Egypt for the United States on November 19, 1974. The court found that appellant's shoulder suffered further damage "as a result of resuming diving work on the salvage project."

On April 25, 1975, appellant's condition was diagnosed as aseptic necrosis of the right humeral head. In November, 1978, a prosthetic device was inserted in appellant's shoulder. As a result of this diagnosis and subsequent surgery, appellant's career as a diver was ended.

## II.

In his first assignment of error, appellant asserts that the trial court erred in concluding that the dive barge was not a vessel "operated by or for the United States" within the meaning of the Suits in Admiralty Act, 46 U.S.C. § 741 and, for that reason, the United States was not liable for the unseaworthiness of the barge or for the negligence of appellant's employer.

In analyzing appellant's contention, it should be noted that the Suits in

Admiralty Act[2] does not itself provide a cause of action against the United States. Instead,. it only acts as a waiver of the sovereign immunity of the United States in admiralty suits. *Nelson v. United States,* 639 F.2d 469 (9th Cir.1980). Thus, the act merely provides a jurisdictional hook upon which to hang a traditional admiralty claim.

The scope of the jurisdiction provided by the Suits in Admiralty Act is somewhat confusing. Prior to 1960, jurisdiction under the Act depended on whether the vessel involved was "... owned by ... or in the possession of ... or operated by or for the United States...." 46 U.S.C. § 741. *See De Bardeleben Marine Corp. v. United States,* 451 F.2d 140 (5th Cir.1971).

The 1960 amendment to 46 U.S.C. § 742, as discussed below, did much to undercut the importance of this determination. However, it appears that a finding that the vessel in question was owned by, possessed by, or operated by or for the United States is still relevant to the question of whether the United States owed a duty of seaworthiness to the injured party. *See Reed v. The Yaka,* 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1962).

There has been little judicial interpretation of the relevant language of 46 U.S.C. § 741. *See Calmar Steamship Corp. v. United States,* 345 U.S. 446, 73 S.Ct. 733, 97 L.Ed. 1140 (1953); *Matson Navigation Co. v. United States,* 284 U.S. 352, 52 S.Ct. 162, 76 L.Ed. 336 (1932); *A.H. Bull S.S. Co. v. United States,* 105 F.Supp. 474 (S.D.N.Y. 1952); *Epstein v. United States,* 86 F.Supp. 740 (S.D.N.Y.1949); *N.S. Byonnes & Son Dampskibsrederi Aktieselskab v. United States,* 298 F. 123 (S.D.N.Y.1923). In the above cited cases, it appears that control by the United States is the crucial element in determining whether a case falls within the jurisdiction provided by § 741. This focus on control is stated more explicitly in *J.W. Petersen Coal & Oil Co. v. United States,* 323 F.Supp. 1198, 1205–06 (N.D.Ill.1970).

[I]t would seem to the court that extensive operation or direction of the vessel by government personnel would be required to make the vessel operated "by the United States" and something closer to a time charter where the Government directs the vessel's overall functions even though the owner may control the operation of the vessel's personnel and equipment rather than a single purpose contract entered into with an independent contractor would be required to make the vessel "operated for the United States."

■ As discussed more fully below, we find that this element of control is missing in this case. Murphy and Steber were responsible for the planning and operation of the Steber divers. Boyd's role only amounted to the monitoring of the operation's progress. This general overseeing is not sufficient to bring injuries related to the unseaworthiness of the barge into the scope of § 741.

■ Appellant also argues that Boyd's assistance in the acquisition of the barge by Murphy from the Suez Canal Authority was sufficient to make the barge a vessel "operated by or for the United States." We disagree. The barge was owned by the Authority which also provided its crew. In addition, Egyptian tug boats were used to move the barge to the salvage site. The only relationship the United States had with the barge was through Boyd who acted as a liaison between Murphy and the Authority. We find that the nexus between the United States and the acquisition of the barge was not sufficiently close to bring the barge within the purview of § 741. Therefore, the United States owed no duty of seaworthiness to the appellant.

III.

However, the above conclusion does not end our inquiry. Appellant argues that whether or not the barge comes under the scope of § 741, the United States is still

---

2. The Suits in Admiralty Act must be construed together with the Public Vessels Act, 46 U.S.C. §§ 781, et seq. The two acts are complimentary jurisdictional statutes providing for mainte-nance of admiralty suits against the United States. *Aliotti v. United States,* 221 F.2d 598 (9th Cir.1955).

liable under the broader jurisdictional waiver of 46 U.S.C. § 742 which provides in pertinent part:

In cases where if such vessel were privately owned or operated, or if such cargo were privately owned or possessed, *or if a private person or property were involved,* a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States....

(emphasis supplied)

In 1960, Congress amended § 742 and added the emphasized language. The history of the amendment is set out in great detail in *De Bardeleben Marine Corp. v. United States,* 451 F.2d 140 (5th Cir.1971). *De Bardeleben* and subsequent cases[3] have generally interpreted this language as "intended to bring all admiralty claims against the United States within the ambit of the SIAA [Suits in Admiralty Act], whether or not involving government cargoes or vessels." *Kelly v. United States,* 531 F.2d 1144, 1149 (2d Cir.1976).

 In light of the above discussion, if appellant's claims are ones which would fall under general admiralty jurisdiction "if a private person or property were involved" then, by way of § 742, the United States has waived sovereign immunity as to those claims. Mindful of the United States Supreme Court's locality and traditionality test for admiralty jurisdiction announced in *Executive Jet Aviation v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), we have no trouble concluding that the Suez Canal is a navigable waterway and that salvage diving is a traditional maritime activity. As a result, appellant's claims based on agency and operational control are cognizable under the admiralty jurisdiction of United States Courts.

## IV.

We must now turn to appellant's substantive arguments relating to whether Steber was an agent of the United States and/or whether the United States was in sufficient operational control of Steber's activities in order to cause the United States to be liable under the Jones Act, 46 U.S.C. § 688, for the negligence of Steber which caused or contributed to appellant's injuries. Appellant contends that the combination of Boyd's visits to the barge, the contract change for the work on the Mecca, and the designation of the civilian members of the operation as part of the "Force" in the Egyptian/United States agreement is sufficient to demonstrate that Steber was an agent of the United States and/or under its operational control. Although appellant couches this argument in terms of an improper determination of the legal standards to be applied, we believe that the question is really one of fact to which our review is limited to the clearly erroneous standard as announced in *McAllister, supra.*

The question of whether Steber was an agent, an independent contractor and an agent, or an independent contractor who breaks the chain of duty and liability before it reaches the United States, is really a question of the degree of operational control which the United States had over Steber. *Restatement of Agency* 2d, § 14 N (1957); *Spinks v. Chevron Oil Company,* 507 F.2d 216 (5th Cir.1975); *Savard v. Marine Contracting Inc.,* 471 F.2d 536 (2d Cir.1972), *cert. denied,* 412 U.S. 943, 93 S.Ct. 2778, 37 L.Ed.2d 404 (1973); *Petition of United States,* 367 F.2d 505 (3d Cir.1966), *cert. denied,* 386 U.S. 932, 87 S.Ct. 953, 17 L.Ed.2d 805 (1967).

 The trial court found that the United States "exercised no operational control over the work of Murphy or Steber personnel." We agree. All plans for the salvage work were made by Murphy. In addition, all of appellant's dives were made under the direct supervision of Steber and/or Murphy.

---

3. *See Bearce v. United States,* 614 F.2d 556 (7th Cir.), *cert. denied,* 449 U.S. 837, 101 S.Ct. 112, 66 L.Ed.2d 44 (1980); *Roberts v. United States,* 498 F.2d 520 (9th Cir.), *cert. denied,* 419 U.S. 1070, 95 S.Ct. 656, 42 L.Ed.2d 665 (1974).

*Cf., McCormick v. United States,* 645 F.2d 299 (1981), *rev'd,* 680 F.2d 345 (5th Cir.1982) (The *McCormick* court first rejected the *De Bardeleben* interpretation and subsequently readopted it.)

Captain Boyd's function was only to monitor progress. The contract between the United States and Murphy placed no duty on the United States to determine whether safe diving procedures were being practiced by the subcontractors and their personnel. The change in orders for the work on the Mecca was done through contract renegotiation and did not amount to the type of control necessary to establish Steber as an agent of the United States. In addition, the designation of Steber personnel as members of the "Force" was simply to provide them immunity from Egyptian criminal law. It did not relate to the degree of control that the United States had over such personnel. Finally, this is not a case where the work to be performed was so inherently and particularly dangerous that the United States might have a special duty placed on it. *Nelson v. United States,* 639 F.2d 469 (9th Cir.1980).

In conclusion, the United States was not liable for appellant's injuries caused by the improper diving procedures permitted during the project.[4]

## V.

In his final assignment of error, appellant argues that the trial court erred in finding that the United States was not liable for maritime medical malpractice in relation to the treatment received by appellant from the Navy medical officer at Ismalia.

█ In answering this question, we need not decide whether the understanding that Murphy and Steber personnel had access to the Navy physician amounted to a binding maritime contract upon which the appellant could rely. As in the previous question, our review of the findings of fact by the trial court is limited. Upon an examination of these facts, we conclude that the decision of the trial court was not clearly erroneous. We base our decision on four groups of facts. First, appellant's shoulder pain first began after hand jetting, a strenuous activity. He pointed this out to the medical doctor who then diagnosed his injury as

relating to soft tissue and told him to return for a checkup. Although there was conflict in the testimony of the medical experts, it appears that such a diagnosis was reasonable and that a physician met with such a complaint would not necessarily be required to X-ray the injury, at least upon first visit. Second, in 1974, little was known in the medical community concerning dysbaric osteonecrosis in general and, specifically, about the incidence of the degenerative process in divers. The testimony revealed that in the early stages of the process, it may be difficult to detect. In addition, there was a great deal of conflicting testimony as to the lag time between the initial insult to the bone and time when the condition would appear on X-rays. The first orthopedic surgeon who examined and X-rayed appellant in December, 1974, was unable to detect the condition. Third, there is discrepancy in appellant's testimony as to whether he ever returned for a second visit to the medical officer. Finally, the general medical facilities in the area were somewhat primitive. Specifically, the Ismalia station did not have an adequate X-ray machine. However, it was possible to evacuate difficult cases to more complete facilities. Even though appellant's pain persisted throughout his stay on the project, he did not seek additional treatment after his first or second visit. Had he continued to seek treatment, it is possible that he could have been sent to other facilities where his condition *might* have been diagnosed.

## VI.

Based on the above discussion, we affirm the decision of the lower court as to all issues presented for appeal.

AFFIRMED.

4. It should be noted that, prior to trial, appellant settled his claim with Steber.