# THE PROVIDENCE.
# THE ELMHURST.
## NEW ENGLAND S. S. CO. v. CITY OF NEW YORK.
## CITY OF NEW YORK v. NEW ENGLAND S. S. CO.
### No. 56.

Circuit Court of Appeals, Second Circuit.
Dec. 4, 1933.

Arthur J. W. Hilly, Corp. Counsel, of New York City (Charles J. Carroll, of Brooklyn, N. Y., and John T. Condon, of New York City, of counsel), for appellant.

Haight, Smith, Griffin & Deming, of New York City (Henry M. Hewitt and W. Parker Sedgwick, both of New York City, of counsel), for respondent.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This appeal is by the city of New York, owner of the ferryboat Elmhurst. The suit was brought in admiralty by the New England Steamship Company, owner of the steamer Providence, to recover damages from the city of New York caused by a collision with her through the negligent navigation of the Elmhurst. The trial judge held the city of New York liable, and entered an interlocutory decree accordingly, sending the cause to a commissioner to report as to damages. He also dismissed the cross-libel by the city of New York, which sought to recover damages to the Elmhurst from the same collision, and entered a final decree in that suit. The questions are purely ones of fact, and we find no error in the disposition of either the libel or cross-libel by the District Court.

On the evening of September 23, 1929, the steamer Providence sailed from New Bedford, bound for New York. The next morning, at Execution Light, which she is said to have passed at 3:58 Eastern standard time, the Providence encountered a fog. According to the testimony of her master, she continued on slowly in this fog for an hour and seventeen minutes, and then anchored at the place where the collision occurred. The distance from Execution Light to the point where the Providence anchored is about ten miles. The master of the Providence testified that the fog continued thick all the way from Execution Light to the place where the Providence anchored. On the way down from Execution Light, the master heard the bell at Stepping Stone, also the bell at Throgs Neck and at Whitestone, but he made no attempt to anchor at any of these places.

The place where the Providence dropped her anchor was about 800 feet to the westward of the College Point bell buoy and some 2,800 feet southwesterly from Clason Point, whence ferryboats operated by the city of New York ran across the East River to College Point, on the Long Island shore. As the master of the Providence came down the river, he heard the bells on the ferry racks at Clason Point, and also heard bells of vessels

anchored below between Clason Point and Hunts Point. He had been running from New Bedford to New York for many years, and was thoroughly familiar with local conditions. When fog made it important to anchor in that part of his course, he had always anchored between Hunts Point and Clason Point. On this occasion he went as far down in the direction of Hunts Point as he dared, in view of the danger of colliding with the vessels whose bells he heard to the westward, and he anchored at 5:15 a. m. at a point where he thought he was clear of the track of the ferries crossing from Clason Point to College Point and back. After she had dropped anchor, the Providence swung to the westward on her chain in the ebb tide, heading east. The distance between the point where she dropped anchor and her stern was about 600 feet. While at anchor, she rang her fog bell according to the regulations. It was a large bell, two and a half feet in height and two and a half feet across the bottom, hung on the foremast ten feet aft of the pilot house and fifteen feet above the deck, and three or four feet above the roof of the pilot house. During the time that the Providence lay at anchor before the collision, the Elmhurst left College Point for Clason Point at 6:17 a. m., returned to College Point from Clason Point at 6:45, left College Point for Clason Point again at 7:16, and started back from Clason Point to return to College Point at 7:46. This last trip was the one in which the collision occurred. On none of the prior trips was there any collision, and the Elmhurst seems to have cleared the Providence without any difficulty. This was natural, because the bow of the Providence lay considerably to the westward of the track of the ferries which, after coming out of the slip at Clason Point, ran on a course southwest by west. Fols. 267, 268, and 290. Such a course would carry them to the east of the bow of the Providence, as had evidently been the case during the prior trips. The course that the Elmhurst took on her last trip is shown by the line drawn by her master on Exhibit 1, and was nearly west, instead of southwest by west. Accordingly, it brought her right into the Providence instead of to the east of her.

The master of the Elmhurst testified that he heard the bell of the Providence ringing for about two or two and a half minutes before the collision occurred, though he said that he had not heard the bell on his previous crossings. The master of the Providence for two or three minutes before the collision likewise heard the whistle of the Elmhurst on her trip from Clason Point to College Point.

The Elmhurst came on until her bow collided with the port or north side of the Providence about 75 feet from the latter's stern. When the Elmhurst struck the Providence, she was running nearly west and substantially out of her course. This is evident from the direction in which she was proceeding, and is further corroborated by the fact that after the collision she went on the mud flats off Rikers Island.

If the anchorage of the Providence is correctly located, the Elmhurst had run about 2,800 feet in the five minutes which elapsed, according to her log, between the time when she left her slip and the collision. Her average speed was therefore at least 5.64 knots per hour, which is excessive in view of the fact that her master said that he could not see his lookout on the ferry deck and that he knew a sound steamer lay at anchor in the vicinity of his course.

The witnesses for the Elmhurst located the anchorage of the Providence at a point only about 150 feet from the College Point buoy and therefore close to the track of the ferries. But the trial court found that she was anchored 800 feet to the westward of College Point bell buoy and was lying about at the point A on Exhibit 1. If she had been only 150 feet to the west of the buoy, the Elmhurst, on her former trips, would probably have collided with the Providence. But, in any event, she would have heard the bell of the latter if she had been attentive. There seems to be no reason to differ with the location of the Providence as determined by the trial judge.

■■ It is contended that when the Providence found she was in a fog she should have anchored at Stepping Stone, Whitestone, or Throgs Neck, and that in any event she should not have anchored as near the course of the ferries running between Clason Point and College Point as she did. We cannot accede to the first contention. Vessels constantly have to proceed in fog conditions that are difficult. The Providence did this with entire success, and moored at or near the place where she had been accustomed to anchor under similar circumstances. The bells of vessels to the westward, which she could not see in the fog, warned her master that it was dangerous to proceed further toward Hunts Point, and he exercised his best judgment as to how far to proceed in that direction. The fact that the Elmhurst had made two trips from Clason Point without fouling the Providence indicates that the collision on the last trip was due to the negligence of the Elmhurst. We think the findings of the court below were

warranted by the evidence and show (1) that the Providence was not obstructing the course of the ferry, and (2) that the master, confronted with the necessity of determining at what point between the track of the ferryboats and the vessels anchored off Hunts Point he could safely adopt for anchorage, exercised a judgment in difficult circumstances that we are not justified in revising. The Mohegan (C. C. A.) 28 F.(2d) 795; The Haven (C. C. A.) 277 F. 957. The Providence clearly was not responsible.

 It remains to determine whether the Elmhurst was guilty of negligent acts that caused the collision. The contention that she was not liable because the accident in the fog was inevitable seems untenable. There is the usual inference of fault that attends the collision of a moving with an anchored vessel. The Elmhurst heard the bells of the Providence and knew that she was in the vicinity of a sound steamer. Under such circumstances she was bound to proceed at such a rate of speed as would enable her to stop within the distance she could see ahead. The Nacooche, 137 U. S. at page 339, 11 S. Ct. 122, 34 L. Ed. 687, N. Y. Central R. R. Co. v. City of New York (C. C. A.) 19 F.(2d) 294. She not only did not do this, but ran some 600 feet to the west of her regular course and into waters where other vessels might properly anchor and where the Providence was lying.

Decree affirmed.