**THE LEHIGH VALLEY NO. 477.**
**THE LT–233.**

**LEHIGH VALLEY R. CO. v. UNITED STATES.**

**No. A–16801.**

District Court, E. D. New York.

June 18, 1945.

Pyne & Lynch, of New York City (Warner Pyne, of New York City, of counsel), for libelant.

T. Vincent Quinn, U. S. Atty., of Brooklyn, N. Y. (Leo J. Curren, Sp. Asst. to U. S. Atty., of New York City, of counsel), for respondent.

BYERS, District Judge.

The libelant's gas hoist lighter, being in tow of the tug LT–233 owned and operated by the United States, was caused to collide with the S. S. Ocean Valor moored port side to the south side of Pier 4, Brooklyn, near the outshore end of the pier, on the afternoon of January 19, 1943, sustaining damage for which recovery is sought in this cause, which is both in rem and in personam.

The facts are scarcely in dispute and may be thus capitulated:

1. Ownership and operation as pleaded are stipulated.

2. The tug (size and horse-power not stated in the testimony but informally represented after the trial to be 110′ by 25′ by 12.2′; 805 horse-power) took the C.R.N. J. barge No. 218 (80′ by 30′) and the L. V. gas hoist No. 477 (106′ by 33′) in tow on January 19, 1943, at about 3:00 P. M., E. W. T., out of the slip between Piers 3 and 4, Brooklyn, for the purpose of shifting them from the bulkhead inshore, to the end of Pier 4; both vessels were light, drawing about 2 feet of water.

3. The tug backed out of the slip, having two bow lines (size undisclosed) out about 25 feet from the tug to the respective stern bitts at the stern corners of the No. 218 which was being towed stern foremost; the latter was close-coupled at the bow, to the bow of the L.V. No. 477.

4. At about the end of Pier 4 the tug let go the bow line leading from her port side to the port stern bitt of the No. 218, intending to wind the tow around the end of Pier 4, and make both vessels fast abreast, outside of two scows already at the pier end.

5. In order to accomplish the foregoing purpose, the L. V. No. 477 had to be brought close enough to the said pier end to enable her to put a line on one of the scows lying there, which, when secured, would have accomplished the first step in the desired result.

6. As the maneuver was conducted, the No. 477 was not brought sufficiently close

to the said pier end or to the said scows to permit of a line's being so handled, and the tow passed obliquely off the pier end, the only towing line then being one bow line leading from the tug's starboard bow to the starboard stern post of the No. 218.

7. In this shape, the tug first started ahead, intending apparently to push the tow back into the slip, but that movement was arrested, perhaps to avoid the collision which actually took place, and the tug started astern again, whereupon the said bow line parted under the strain thus imposed, leaving the barges free to move as best they could.

8. The No. 477 promptly fetched under the stern of the S. S. Ocean Valor, striking hard enough to sustain the damage complained of.

9. Piers 3 and 4 are about 1300 feet long, and extend in a northwesterly direction from the shore front; the width of the slip between these piers is about 300 feet.

10. The S. S. Ocean Valor (estimated beam 50 feet) lay alongside Pier 4 as stated, reducing the width of the slip for present purposes.

11. There was another vessel lying halfway up the slip alongside Pier 3, and her beam, added to that of the Ocean Valor, left not less than 200 feet width of the slip available to the tug in shifting these two barges or lighters.

12. At about 3:00 P. M., E. W. T., on the day in question the tide was slack (according to stipulation).

13. From noon until 4:00 P. M., E. W. T., on that day the wind was N.; N. W.; N. W.; W.; N. W., of a force of 11, 19, 19, 36, and 42 M. P. H., respectively. Between 2:00 and 3:00 P. M. the greatest velocity was 27 miles; and between 3:00 and 4:00 P. M., 56 miles. Those periods of greatest velocity were 5 minutes in duration.

14. Storm warning was displayed in the New York district, pursuant to instructions issued at 5:00 A. M. on that day, reading in part: "Increasing winds becoming 35 to 45 miles per hour this afternoon and tonight".

15. The temperature between 1:00 and 2:00 P. M., E. W. T., was 36° F. and between 2:00 and 3:00, 40°, and between 3:00 and 4:00, 41°; and between 2:00 and 3:00 o'clock there was a precipitation of sleet in the vicinity of the Battery.

16. The striking of the libelant's gas hoist No. 477 against the stern of the S. S. Ocean Valor was not the result of inevitable accident.

The foregoing recital admits of but little discussion.

▇ To quote from the opinion in New England Steamship Co. v. City of New York, 2 Cir., 67 F.2d 865, 1933 A. M. C. 1670, at page 1673: "There is the usual inference of fault that attends the collision of a moving with an anchored vessel."

▇ No burden of explanation or exculpation has been assumed by the tug to account for the happening as set forth; all that is offered is the argument that this was a case of inevitable accident. Perhaps the striking of the No. 477 was the inevitable result of the manner in which the maneuver was conducted, but there was nothing inevitable about the lack of nautical skill displayed by the tug, so far as the testimony shows; it does not appear whether the two bow lines which were used as towing hawsers were of such size as to be adequate for the job; there is no testimony tending to show that one of those lines had to be dropped in order that the tow might have been brought into position for making these barges or lighters fast to the scows already in position at the pier end.

There is no testimony to justify the action of the tug in backing out of the slip the second time, without first putting out the line which had been dropped, leading from the port bow of the tug, to the inside stern bitt of the No. 218, so that the second stage of the maneuver would not have to be conducted with but one towing line.

The weather conditions were not so unexpected or so unusual as to constitute an element of inevitable accident under the conditions shown, or some one qualified to express an opinion on the subject would have been called as a witness to demonstrate the contrary.

The position of these piers exposed the slip between them to the force of a northwest wind, and there is no testimony to the effect that the sole remaining towing line carried away because of the force of any unusual gust of wind, or other condition not reasonably to have been foreseen by those possessing customary skill in conducting towing operations in the harbor of New York.

The respondent cites a few cases involving the breaking of a hawser, in each of which the Court was assisted by testimony concerning the size and characteristics of the towing line involved; there is no such testimony in this cause.

The libelant is entitled to the usual interlocutory decree with costs.

A request has been made for correction of the minutes, or to reopen concerning testimony of the witness Ostrander, the captain of the No. 477, respecting the mooring of his vessel at the end of Pier 3 after this collision, apparently because of its possible bearing upon other litigation involving the subsequent adventures of his vessel.

He was somewhat adroitly asked a question as to how he was tied up in that position, which had nothing to do with this cause, and that testimony has simply been disregarded in making this decision. Whether he would wish to change either its form or content, would be of no present consequence.

It is thus deemed unnecessary to change the present record, or to amplify it in the sole interest of other matters not now involved.

The Commissioner to be appointed will satisfy himself according to the evidence, as to the nature and extent of the damage sustained by the libelant's gas hoist lighter No. 477 as the result of its collision with the S. S. Ocean Valor.

Settle interlocutory decree.