**GEO. W. ROGERS CONST. CORP.**

v.

**UNITED STATES et al.**

**STATEN ISLAND RAPID TRANSIT RY. CO.**

v.

**UNITED STATES et al.**

United States District Court
S. D. New York.

Jan. 15, 1954.

J. Edward Lumbard, U. S. Atty., Kirlin, Campbell & Keating, New York City (Gilbert S. Fleischer and Eugene F. Gilligan, New York City, of counsel), for respondent United States.

Burlingham, Veeder, Clark & Hupper, New York City (Adrian J. O'Kane and Richard W. Palmer, New York City, of counsel), for claimants-respondents-impleaded.

LEIBELL, District Judge.

The Findings of Fact in this case tell the story of a very unusual accident which occurred at the B. & O.'s bridge over the Arthur Kill, at Staten Island, New York. An inference of fault arises against The Cayuse, a moving vessel which collided with the properly-moored Whirley No. 32 and pushed The Whirley into a lawful bridge. The Providence, 2 Cir., 67 F.2d 865; Carr v. Hermosa, 9 Cir., 137 F.2d 983. The issues in this case center around the question of who is liable, the respondent or the respondent-impleaded, or both. It is the government's contention that Dalzell, the respondent-impleaded, is liable for the libellants' damages, and that if The Cayuse is liable in rem to the libellants, she is only secondarily liable. Dalzell's counsel argues that the respondent, The United States of America, is solely liable and that Dalzell should be completely exonerated.

The Conclusions of Law place the entire liability on the respondent, the

United States, as the owner of the tanker Cayuse. That the tanker, Cayuse, was unseaworthy, in respect to her port steering engine and her port anchor, was established through the depositions and testimony of her officers. The unseaworthiness was a proximate cause of the accident. That Pilot Ambrose did not act either promptly or rightly when he knew that a collision with the bridge fender or The Whirley No. 32 was imminent, is shown by the physical facts, the distances shown on Court Ex. 1, the entries in the bell book as to the engine's speed and the changes ordered, and by the depositions and testimony of those on the bridge of the tanker, including the Pilot, Ambrose. The faulty navigation of the pilot is chargeable to The Cayuse. Although the pilot was regularly employed by Dalzell as a tugboat captain, he was also a United States licensed pilot for New York Harbor, including the Kills. He has been tugboating in the Harbor for many years and was recognized as a competent pilot.

■ Dalzell's pilotage clause, published in Dalzell's Schedule of Standard Rates and Terms for tug service in New York Harbor, is not contrary to any rule of public policy and is binding on the respondent, the owner of The Cayuse. Dalzell's "responsibility is not to be extended beyond the service that it undertook to perform. It did not furnish pilotage. The provision that its tug captains while upon the assisted ship would be the servants of her owner is an application of the well-established rule that when one puts his employee at the disposal and under the direction of another for the performance of service for the latter, such employee while so engaged acts directly for and is to be deemed the employee of the latter and not of the former. Denton v. Yazoo & M. V. R. Co., 284 U.S. 305, 308, 52 S.Ct. 141, 76 L.Ed. 310. It would be unconscionable for petitioner upon occurrence of a mishap to repudiate the agreement upon which it obtained the service." The quotation is from Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, at page 294,

53 S.Ct. 135, at page 136, 77 L.Ed. 311. Pilot Ambrose in navigating The Cayuse under her own propelling power, "became the servant of the owner of the vessel with respect to giving orders to any of the tugs engaged in the towage service and with respect to handling the vessel, and the tugs were thereupon released from faults or acts of negligence" of the pilot. The Margaret A. Moran, 2 Cir., 57 F.2d 143. See also Moran Towing & T. Co. v. Navigazione Libera Triestina, S. A., 2 Cir., 92 F.2d 37.

When it appeared to the pilot that a collision with The Whirley No. 32 was imminent, about the time the bridge of The Cayuse was under the Goethals bridge, because of the then heading of the ship and the fact that The Cayuse had not answered fast enough to an easy left wheel, he tried to help the tanker swing to the left by increasing her speed with a touch of half ahead, and he ordered the wheel hard left. When the increase in speed with the wheel hard over, had no effect in bringing The Cayuse to the left, the pilot ordered the engines slow ahead and ordered the tug Dalzellaird to back. He also ordered that the port anchor be let go. He did not call upon the tug Lloyd H. Dalzell to help in the emergency, because he could not get her around in time. His order to let go the port anchor could not be obeyed because that anchor was frozen or jammed and of that he had no knowledge. But even if the port anchor had been available, the order was given so late that in all probability it would not have prevented a collision altogether. If it had swung the stem of The Cayuse to the left, it is likely that The Cayuse would have hit the easterly fender rack of the B. & O. span. When the Second Mate dropped the starboard anchor, which was pulling the stem of The Cayuse to the right, then (at 7:50) the pilot ordered The Cayuse's engines full astern. The collision with The Whirley No. 32 took place at 7:51. The Cayuse did not develop sternway until after the collision with The Whirley.

When I questioned the pilot as to what he might have done to avoid the collision if he had acted sooner, he remarked that "hindsight is better than foresight", and that "We have so many narrow escapes every day in this business". But a pilot is engaged to navigate because of his experience in handling ships, and his special knowledge of the waters and local navigating conditions. He is supposed to have enough foresight to avoid collisions. He holds his rank and rating because he is considered expert enough to act promptly and right in extremis.

■ If Pilot Ambrose had ordered The Cayuse's engines full speed astern and The Dalzellaird to back, as the danger was developing when the stem of The Cayuse passed under the Goethals bridge, and if he had ordered the following tug, The Lloyd H. Dalzell, to the starboard quarter of The Cayuse to hold the tanker away from the abutment of the Goethals bridge, any collision with The Whirley No. 32 or the easterly fender of the B. & O. bridge span, could have been avoided. His failure to take proper measures to avoid the collision constituted faulty navigation and was a proximate cause of the accident.

■ Undoubtedly The Dalzellaird, the tug on the port bow of The Cayuse, did all that she was called upon to do by the pilot. The tug had to await his orders. Likewise the following tug, The Lloyd H. Dalzell, was not supposed to act independently, if there was a likelihood that the pilot might have orders for her. The imminence of the collision was probably not as apparent to the following tug as it would be to those aboard The Cayuse. After the collision, The Lloyd H. Dalzell passed along the starboard side of The Cayuse and played a hose on The Whirley No. 32, to put out a fire that had started aboard her. The evidence did not disclose any negligence on the part of either tug.

There seems to be some dispute as to just what Pilot Ambrose was told about the steering gear not working properly, while The Cayuse was being turned around at Bayway. In the penned statement, which the master of The Cayuse added to the typewritten statement which the pilot asked him to sign, there appears the following:—

"While turning around the quartermaster informed me that rudder indicator showed 15 degrees rudder when wheel was hard over."

That is what the Pilot testified he was told by the Master. The pilot also testified that when the ship was practically turned around she responded well to a hard rudder, the way he expected she would, and he straightened her up in the channel and headed north. He so informed the Master of The Cayuse at the time.

The government argues that Dalzell is liable because Pilot Ambrose went ahead with The Cayuse with only two tugs, after he had been told that the rudder indicator did not seem to register properly, when The Cayuse's wheel was put over hard after she had been turned around at Bayway. But that is not the whole story. The Pilot was not told that there had been trouble with the telemotor part of the steering apparatus on the last voyage of The Cayuse into the port of New York. He thought that the trouble was with the indicator and that it was only momentary. When The Cayuse responded to a right rudder at Gulfport he told Captain Fields that The Cayuse was steering all right, but in response to the Captain's request he kept both the tugs. The Captain's request was a precautionary matter evidently based on what he knew about the vessel's steering gear. If the Pilot had known that the steering gear was out of order he would have ordered two additional tugs, if The Cayuse was to proceed and not be put back to her dock. It would not have been any money out of the Pilot's pocket and it would have meant more money for the Dalzell Towing Company. There would have been no reason for him not to order additional tugs if he had known that the steering apparatus was not responsive.

The opinion the Pilot formed that The Cayuse was steering all right, was his opinion as the Pilot while he was navigating from the bridge of The Cayuse. If he was wrong in this conclusion it was a mistake he made as the Pilot, for which The Cayuse and its owners are responsible under the pilotage clause of Dalzell's Standard Rates and Terms. If he failed to re-dock The Cayuse or order extra tugs, that mistake was based on his conclusion that the steering gear was operating all right, which, as above indicated, was a mistake he made in his capacity as pilot.

■ For the foregoing reasons—the unseaworthiness of The Cayuse as to her steering gear and port anchor, the faulty navigation of the pilot as an employee of the owner of The Cayuse, the lack of fault on the part of the two Dalzell tugs—I have concluded that the respondent, United States of America, as owner of The Cayuse is solely liable for the damage to The Floating Whirley No. 32 and the B. & O. bridge. Submit a decree in accordance with the Conclusions of Law.

### Supplemental Opinion

On April 28, 1953, I filed Findings of Fact and Conclusions of Law in these two admiralty actions, which had been consolidated for trial. I also filed an opinion.

As to action A153–185, Conclusion of Law XI provided:—

"XI. Libellant, Geo. W. Rogers Construction Corporation, the owner of the crane barge, Floating Whirley No. 32, is entitled to an interlocutory decree against the respondent, The United States of America, for the recovery of the damage sustained by the crane barge, together with interest and costs, with an order of reference to a commissioner to ascertain the amount of such damage."

When the interlocutory decree in the Rogers action was submitted on July 9, 1953, the respondent, The United States of America, raised the point that the S. S. Cayuse was a "public vessel" of the United States and that under Sec. 782 of Title 46 U.S.C.A. The Public Vessels Act, libellant was not entitled to any interest "up to the time of the rendition of judgment" i. e., the entry of a final decree. The libellant, Rogers Construction Corporation, contends that the S. S. Cayuse at the time of the collision was a "merchant vessel" and that under the provisions of the Suits in Admiralty Act, T. 46 U.S.C.A. 745, the Court should allow interest from the date "when suit on such claim is brought", the date of the filing of the libel (December 10, 1947).

The parties have since examined government records as to the engagement of the S. S. Cayuse on voyage No. 26, at the time of the collision, and on the voyages prior and subsequent thereto (Nos. 25 and 27), and have submitted a stipulation of facts dated December 11, 1953, and filed December 21, 1953, to which are annexed photostats of various documents.

The questions now presented involve the status of the S. S. Cayuse at the time of the collision with The Floating Whirley No. 32 at 7:51 A.M. on November 11, 1947. Did The S. S. Cayuse have the status of a "merchant vessel" and does the Court have jurisdiction under the Suits in Admiralty Act and is the interest on the claim allowable from the date of the institution of the suit? Or, was The S. S. Cayuse a "public vessel" at the time of the collision, and is the Court's jurisdiction based on the "Public Vessels Act", and is the interest to run from the date of the rendition of judgment, the date of the final decree, which is yet to be entered herein?

The allegations of the libel asserted jurisdiction in this Court under one statute or the other. No proof was offered at the trial on the points now raised and they were not referred to in the briefs, although a proposed Conclusion of Law submitted by libellant did specify "interest and costs" (the language later used in the Court's Conclusion of Law XI), but no date for the beginning of

the interest period was suggested or fixed.

On November 11, 1947, the date of the collision, the tanker, S. S. Cayuse, was owned and operated by the United States, acting by and through the United States Maritime Commission. The Keystone Shipping Company acted as general agent for the United States in connection with the vessel, under the standard form of service agreement (dated July 10, 1941, with later addenda) for vessels of the War Shipping Administration, to which the United States Maritime Commission was the statutory successor. The S. S. Cayuse had been allocated to the Keystone Shipping Company by the Maritime Commission for servicing, under the standard form, on April 16, 1947, and the Keystone Shipping Company accepted delivery of the vessel on April 22, 1947. A year later, on April 23, 1948, the Keystone Shipping Company redelivered the tanker Cayuse to the Maritime Commission, pursuant to the general agency service agreement.

The S. S. Cayuse was operated by the Maritime Commission and on November 11, 1947, was manned by civil service officers and a crew, who were paid for their services by the United States acting through its said agent, Keystone Shipping Company.

On June 27, 1947, the Navy Department, Bureau of Supplies and Accounts, entered into a letter agreement with the Maritime Commission, for "tanker voyage charter parties", under which individual charters were later to be arranged and consummated.

On November 4, 1947, the Navy Department placed an order with the Standard Oil Export Co. for loading the tanker Cayuse with approximately 100,-000 barrels of a Navy special grade fuel oil on or about November 19, 1947, at Caripito and/or Aruba, N.W.I., for delivery to the United States Naval Fueling Depot at Norfolk, Virginia. Copies of the order were sent to the Maritime

Commission, Tankers Division, and to the Keystone Shipping Company.

On November 5, 1947 the Maritime Commission nominated the tanker Cayuse, when ready after voyage No. 25, for a voyage for the United States Navy as charterer on Voyage No. 26; and on November 6, 1947, the Maritime Commission instructed the Keystone Shipping Company that the tanker, upon completion of discharge at United States Atlantic ports, about November 12, 1947, was to proceed on Voyage No. 26, to load at one or more Caribbean ports and discharge at one or more North Hatteras ports for the United States Navy as charterer.

On November 11, 1947, at 2:05 A.M. the tanker Cayuse completed the discharge of a cargo of petroleum products at the Bayway Plant of the Standard Oil Company, New Jersey; and the Keystone Shipping Company, as general agent for the United States, directed the Master of the Tanker Cayuse to proceed to Aruba, N.W.I., to load a cargo of fuel oil and to deliver the fuel oil to the United States Navy at the United States Navy Fueling Station at Norfolk, Virginia. That voyage from Bayway, New Jersey, to Aruba, N.W.I., and then to Norfolk, Virginia, was designated as Voyage No. 26 according to the entries made in the tanker's bridge log.

It further appears from the stipulation of facts herein, dated December 11, 1953, that:—

"10. The tanker Cayuse left Bayway, New Jersey, en route to Aruba at 7:26 a. m. on November 11, 1947 and shortly after departure the collision described in the libel occurred. Subsequent to the collision and on the same day the Cayuse obtained a certificate of seaworthiness [1] from the American Bureau of Shipping and thereupon proceeded to Aruba and the cargo of fuel oil which had been ordered by the Navy was placed aboard the vessel and then transported to the

---

1. This was obtained because the tanker had been in a collision.

United States Naval Fueling Station, Craney Island, Norfolk, Virginia. The charter hire for Voyage #26 was duly billed to and paid by the Navy Department in accordance with the provisions of Contract N7sx–2588. (Refer to Exhibit C).

"11. On Voyages #25 and #27 tanker Cayuse was 'employed as a merchant vessel' in the transportation of commercial cargo for hire."

It appears from the Court's Finding of Fact (14C) herein that at 7:51 A.M. on November 11, 1947, (25 minutes after undocking at Bayway, New Jersey) the bow of The Cayuse came in contact with the inshore bow corner of libellant's Floating Whirley No. 32 and pushed the boiler housing of The Whirley into the easterly span of the B. & O. bridge, a lawful structure across the Arthur Kill. The span was thereby dislodged and fell on The Whirley No. 32 causing it damage for which the Rogers Construction Company, as owner, filed its libel herein against the United States, which thereupon impleaded the Dalzell Towing Company and two of its tugs. The Whirley No. 32 was lawfully moored on the easterly side of the easterly fender rack of the B. & O. bridge abutment at the time she was struck by The Cayuse.

As the trial judge, sitting in Admiralty, I held The Cayuse was solely at fault for the damage sustained by The Floating Whirley No. 32, and dismissed the libel and petition impleading the Dalzell Towing Company and two of its tugs. Under Conclusion of Law No. XI I directed that an interlocutory decree be entered in favor of the libellant, Geo. W. Rogers Construction Corporation, against the United States for the damage sustained by the crane barge, Floating Whirley No. 32, "together with interest and costs", with an order of reference to a Commissioner to ascertain the amount of the damage suffered by The Cayuse.

A final decree was awarded the owner of the bridge, the Staten Island Rapid Transit Railway Company, for $100,000 against The United States of America. The Railway Company had previously received a payment of $100,000 from the United States under the terms of a loan receipt dated April 2, 1952. The suit of the Railway Company was prosecuted for the benefit of the United States of America against the Dalzell Towing Company et al., and its tugs, impleaded respondents. No question of interest is involved in that suit, because it was dismissed on the merits in respect to the impleaded respondents, the Dalzell Company et al., and its tugs.

\* \* \* \* \* \*

Both sides refer to and cite as supporting certain of their contentions on the question of "interest" the recent case of Calmar S. S. Corp. v. United States, 345 U.S. 446, 73 S.Ct. 733, 737, 97 L.Ed. 1140. That case involved a privately owned, privately manned and privately operated vessel, the S. S. Portmar, which, at the time it was beached, was transporting a cargo of war material for the United States for hire. In ruling that The Portmar was "employed as a merchant vessel" so as to give the District Court jurisdiction under the Suits in Admiralty Act, the Supreme Court declined to recognize the nature of her cargo as a criterion for determining the character of the vessel. Instead the Court accepted "a test under which the arrangements effectuated by a charter-party are the controlling facts" and stated that such a test "unlike the cargo test" would lend itself "to simple and expeditious application, reasonably predictable in result."

The libellant contends that The Cayuse is essentially a "merchant vessel" because although owned by the United States it is owned through the United States Maritime Commission. Libellant likens the Maritime Commission to a private corporation engaged in the business of chartering its ships for hire, and argues that The Cayuse, as a part of the United States Merchant Marine, was no different from any privately owned tanker with which it was in competition.

Libellant further argues that the position of the Maritime Commission, in respect to the chartering of The Cayuse to the Navy, is comparable to that of the Calmar S. S. Corp. in respect to its charter party with the United States for the services of the S. S. Portmar; and that the "charter party test" laid down in the Calmar case should be applied here. According to libellant, if that test is found applicable, the essential "merchant character" which libellant claims for The Cayuse will not be altered despite its voyage charter to the Navy.

■ The "charter party test" which was laid down in Calmar S. S. Corp. v. United States, supra, is restricted in its application to a privately owned vessel carrying public cargo, because it is by resort to the terms of the charter party that the Court is able to decide the nature of the Government's interest in a privately owned vessel and the extent of control exercised by the Government over said vessel at a given time.

■ A vessel owned absolutely by the United States through the Maritime Commission and operated by officers who are civil service employees of the United States and by a crew paid by the United States through its general agent, is a "public vessel" within the purview of the Public Vessels Act, T. 46 U.S.C.A. § 781 et seq., unless it is engaged in transporting cargo for hire for private shippers. If it is so engaged, it is operated as a "merchant vessel" serving the interests of private commerce. Tort actions involving such a vessel so engaged would come under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq. But if the vessel is chartered to the United States Navy to carry a cargo of a special grade of oil to a United States naval station to be used as fuel by Navy vessels, it is a vessel which by every test is in the public service of the United States and should be classed as "a public vessel of the United States". Tort actions involving such a vessel so engaged would come under the Public Vessels Act.

It was held in The Western Maid, 257 U.S. 419, at page 429, 42 S.Ct. 159, 160, 66 L.Ed. 299, that a vessel "owned, absolutely or pro hac vice, by the United States, and employed in the public service" did not come under the scope of the Shipping Act of 1916 because it was not employed in ordinary merchandising but "was engaged in a public service", carrying food stuffs for European relief, which "was one of the constituents of our activity in the war (World War I) and its sequel." The Supreme Court in the Calmar case stated:—"The United States today would be subject to suit on the facts of The Western Maid under the Public Vessels Act." The opinion of the Supreme Court in the Calmar case also indicates that an action under the Public Vessels Act could be brought in the District Court for damages sustained in a collision, involving a vessel under bareboat charter to the United States and carrying war material. And, of course, the same would be true of such a vessel if owned absolutely by the United States, instead of being under bareboat charter to the United States.

Is a special grade of fuel oil for the United States Navy, war material? If a cargo of fuel oil was being carried by The Cayuse for the Navy while we were at war, there would be no doubt about it. The rule should not be different while we are at peace. Fuel oil is today as essential to the operation of the Navy as was coal forty years ago. "Coaling stations" are now "Fueling Depots". In fact, the Maritime Commission's "tanker nomination" of the S. S. Cayuse to meet the Navy's request for a vessel to carry the 100,000 barrels of this special grade of fuel oil states, "Program-Military-Navy Atl.".

\* \* \* \* \* \*

The provisions of Tanker Operations Regulation No. 1 Revised, dated January 11, 1943, pertaining to the service agreement, and relating to "Voyage Periods", stated:—

"Subject: Voyage Periods

"Tanker Operations Regulation No. 1 dated August 1, 1942 is here-

by cancelled and superseded by the following:

"1. All voyages shall be numbered consecutively, each number to be preceded by the symbol WSA.

"2. Voyage WSA No. 1 shall commence as of the time of delivery to the first Agent or General Agent.

"3. All subsequent voyages shall commence as of 12:01 A.M. of the day following completion of discharge unless vessel sails from discharging port prior to midnight, in which event the voyage shall commence as of Noon the day of sailing.

"4. Voyages shall be terminated as of midnight of the day on which discharge is completed unless vessel sails from discharging port prior to midnight, in which event the voyage shall terminate as of Noon the day of sailing.

"A. If dry cargo is carried in addition to bulk cargo (oil, molasses, caustic soda, etc.) the termination of voyage shall be governed by the product discharged last.

"B. Where dry cargo only is carried on what would otherwise be a ballast passage, same is to be considered as a part of the current voyage.

"5. Vessels to be redelivered to W. S. A. or transferred to another Agent or General Agent shall continue the terminating voyage to the time of such redelivery or transfer. If a vessel is transferred to another Agent or General Agent, WSA voyage numbers are to continue consecutively from original delivery to former Agent or General Agent."

There was a notation in the log of The Cayuse that the tanker was on Voyage No. 26 at the time of the collision. Libellant observes that if Regulation No. 1 is applicable to the "interest" issue now presented, Voyage No. 26 would not have commenced until noon of November 11, the vessel having sailed from the discharging port (Bayway, New Jersey) prior to midnight of November 11th. The collision took place at 7:51 A.M. on November 11th. In my opinion this regulation has no probative value in determining the status of The Cayuse at the time of the collision. The Regulation was established for purposes not material to the question of the "status" of the vessel. It was intended to fix the commencement of the voyage period, as applicable to various provisions of the Service Agreement with the Keystone Shipping Company, and to the charter itself in respect to certain rights and obligations of the Maritime Commission and the United States Navy.

The libellant strongly urges that if the S. S. Cayuse did become a "public vessel" it was not until she commenced loading the cargo of fuel oil at Aruba or until it became apparent that she would be in a position to accomplish that task.

In support of this contention libellant points to the fact that pursuant to a letter agreement between the War Shipping Administration and the Navy Department, the voyage rates were to be those in effect on the date the loading of the cargo was completed. In addition, libellant emphasizes certain of the terms of the charter party itself. Those mentioned pertain to the chartered vessel's readiness to load by the cancelling date; the commencement of laytime after notice of readiness to load has been given to the charterer; and the imposition of "full freight charges on all cargo as loaded". Libellant infers from the foregoing that the voyage under the Navy charter could not have commenced until The Cayuse had reached a loading port and tendered her readiness to receive cargo.

I have no doubt that if the S. S. Cayuse had been unable to meet its obligations under the charter party the Navy would have been free to cancel the charter, and as a result the charter party would never have been consummated. But the possible inability of the S. S. Cayuse to carry out the terms of the charter party, a possibility that never became a reality, had nothing to

do with the status of the vessel while it was "en route" to Aruba, there to take aboard the cargo of oil in performance of the charter party. In making the voyage to Aruba, preliminary to loading the cargo of oil at that port, the Cayuse was performing that part of its charter which required it to proceed from the place where it unloaded the cargo of Voyage No. 25, to the place where it was to take aboard the cargo of Voyage No. 26. Therefore, while "en route" to Aruba from Bayway, New Jersey, the Cayuse was engaged in a public service and was a "public vessel" owned and operated by the United States. The tanker was sailing in ballast, but even without any cargo aboard she was a United States vessel, owned absolutely; manned by officers and a crew who were employees of the United States; and operated by the Maritime Commission. Naturally, the tanker would proceed to Aruba without any cargo. She would not be carrying oil to Aruba. She was to proceed there "dirty" i. e., without having any residue of her prior cargo of oil cleaned out.

The fact that the United States Navy paid freight charges to the United States Maritime Commission, does not strengthen libellant's position. In United States v. City of New York, D.C. S.D.N.Y., 8 F.2d 270, it was held that The Waubesa, a vessel owned by the United States, was employed as a public vessel while carrying from Philadelphia to Falmouth, England, a cargo of grain owned by the United States Grain Corporation. The United States Grain Corporation had been incorporated by the United States to "engage in the relief of the starving countries in the East, not in the mercantile business". The doctrine of The Western Maid, 257 U.S. 419, 42 S.Ct. 159, 66 L.Ed. 299, was held to apply to the Waubesa case. The Supreme Court in the Calmar decision distinguished the S. S. Waubesa from the S. S. Portmar, as a vessel "owned by the United States * * * engaged in public business" and "in no sense operated for hire", despite the fact that the

Grain Corporation was charged the freight on the cargo carried.

\* \* \* \* \* \*

 I have accordingly amended the Conclusions of Law heretofore filed on April 28, 1953, by adding thereto a Conclusion No. X-A, to the effect that at the time of the collision on November 11, 1947, the S. S. Cayuse was a "public vessel". Conclusion of Law No. XI has been amended by providing that the "interest", on the judgment to be entered after the amount of the damages has been determined, shall run from the date of the final decree. Additional Findings of Fact have also been made, in conformity with the stipulation of the parties, dated December 11, 1953, filed December 21, 1953.

The interlocutory decree in the Rogers case is being corrected to provide for "interest" from the date of entry of the final decree, and as thus corrected will be signed and filed.